In re BRANIFF, INC., Debtor.

BRANIFF, INC., Plaintiff,

v.

GPA GROUP PLC, etc., et al., Defendants.

Bankruptcy No. 89–03325–BKC–6C1. Adv. No. 89–230.

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Dec. 12, 1989.

Findings of Fact and Conclusions of Law Sept. 10, 1990.

Howard T. Glassman, Joel C. Shapiro, Matthew J. Siembieda, Faith R. Greenfield, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for plaintiff.

Francis L. Carter, Coll, Davidson, Carter, Smith, Salter & Barkett, Miami, Fla., Glenn C. Shrader, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for GPA Group and Affiliates.

Thomas C. Rice, Simpson, Thacher & Bartlett, New York City, Jeffrey Jontz, Holland & Knight, Orlando, Fla., for AVSA.

Peter N. Hill, Wolff, Hill & Meininger, Orlando, Fla., for Wilmington Trust Co.

Leon C. Marcus, Richard Levy, Marc Richards, Milgrim, Thomajan & Lee, New York City, for the Official Committee of Unsecured Creditors of Braniff, Inc.

David M. Levine, McDermott, Will & Emery, Miami, Fla., for the Official Committee of Noteholders of Braniff, Inc.

## JUDGMENT AND FINAL DECREE

C. TIMOTHY CORCORAN, III,
Bankruptcy Judge.

THIS CAUSE came on for trial on November 20, 21, 22, 24, and 25, 1989, of the following four consolidated matters:

1. Adversary proceeding No. 89–230 filed in this Chapter 11 case by Braniff,

Inc. the debtor, as plaintiff, against GPA Group Limited; now known as GPA Group plc; GPA Corporation; GPA Leasing USA I, Inc.; Wilmington Trust Company; AVSA, S.A.R.L.; and Air Tara Limited; as defendants, and including the counterclaim of GPA Group plc; GPA Leasing USA I, Inc.; and Air Tara Limited against Braniff, Inc.;

2. The motion filed in this Chapter 11 case by GPA Leasing USA I, Inc. for relief from the automatic stay and for adequate protection (Document No. 77);

3. The motion filed in this Chapter 11 case by the debtor for an order authorizing rejection of the A320 partial assignment, assumption, release, and amendment agreement (Document No. 306E); and

4. The motion filed in this Chapter 11 case by GPA Group plc, GPA Leasing USA I, Inc., GPA Corporation, and Air Tara, Limited to Require Braniff to Assume or Reject Executory Contracts Within a Reasonable Time (Document No. 395A);

the undersigned United States Bankruptcy Judge presiding; and the issues having been duly tried; and a decision having been duly rendered; and the Court having found that it is of critical importance to all parties that a decision be made immediately and that the entry of this judgment and final decree therefore cannot await the preparation and entry of extensive findings of fact and conclusions of law; and the Court having made preliminary findings of fact and conclusions of law stated orally and recorded in open court following the close of the evidence; and the Court having further announced that it will substitute for the preliminary findings and the conclusions its final, written findings of fact and conclusions of law in the near future as soon as they can be prepared and entered; it is

ORDERED, ADJUDGED, DECLARED, and DECREED as follows:

1. A declaratory judgment is entered in favor of Braniff, Inc. ("Braniff") and against GPA Group plc f/k/a GPA Group Limited ("GPA Group"), GPA Corporation ("GPA Corp."), GPA Leasing USA I, Inc. ("GPA Leasing"), Wilmington Trust Company ("Wilmington"), AVSA S.A.R.L.

("AVSA") and Air Tara Limited ("ATL") that:

(a)(i) the notices of termination dated September 27, 1989 from GPA Leasing to Braniff in connection with the Aircraft Sublease Agreements for GPA 1989 BN-1 through BN-5; (ii) the notice of termination dated September 27, 1989 from GPA Group and GPA Leasing to Braniff in connection with the Aircraft Lease Commitment dated as of December 30, 1988; (iii) the notice of termination from ATL to Braniff in connection with the Aircraft Lease Agreements between ATL and Braniff for the BAC1-11 200 series aircraft, (iv) the letter dated September 27, 1989, from ATL, GPA Group and GPA Fokker 100 (N.A.) N.V. ("GPA Fokker") to Braniff confirming the expiration of the September 1, 1989 Letter Agreement ("September Letter Agreement") among GPA Group, GPA Fokker, ATL and Braniff, and (v) the letter dated September 29, 1989 from GPA Group and GPA Leasing to AVSA informing AVSA that GPA Group and GPA Leasing had transmitted on September 27, 1989 to Braniff a notice of the termination of the Aircraft Lease Commitment, were null and void and of no force or effect.

(b) The Amended and Restated Airbus A310/A320 Purchase Agreement between AVSA and Braniff dated as of December 30, 1988 together with exhibits ("Purchase Agreement"); the A320 Partial Assignment, Assumption, Release and Amendment Agreement among Braniff, GPA Group and AVSA dated as of December 30, 1988 ("Partial Assignment"); the Aircraft Lease Commitment Agreement between Braniff and GPA Group dated as of December 30, 1988 ("Lease Commitment"); the Aircraft Sublease Agreement dated as of July 13, 1989 for A320 aircraft BN-1; the Aircraft Sublease Agreement dated as of August 30, 1989 for A320 Aircraft BN-2; the Aircraft Sublease Agreement dated as of September 5, 1989 for A320 Aircraft BN-3; the Aircraft Sublease Agreement dated as of September 18, 1989 for A320 Aircraft BN-4; and the Aircraft Sublease Agreement dated as of September 22, 1989 for A320 Aircraft BN-5 and the Aircraft

Lease Agreements between ATL and Braniff relating to BAC1–11 200 series aircraft having manufacturer's serial numbers 007, 009, 011, 013, 020, 041, 043, 057, 061, 085 and 127 ("BAC1–11 Leases") are and remain in full force and effect, subject to the terms and conditions thereof, to applicable law, to the terms and conditions of this Judgment and Final Decree and to further order of the Court including any ruling on AVSA's Motion for Relief from the Automatic Stay. The Purchase Agreement, the Partial Assignment and the Lease Commitment are hereinafter referred to collectively as "Agreements". The Aircraft Sublease Agreements are hereinafter referred to collectively as the "Subleases".

2. (a) A declaratory judgment is entered in favor of Braniff and against GPA Group, GPA Leasing, and GPA Corp. declaring that such defendants' actions in connection with the four A320 Aircraft delivered by AVSA after the filing of Braniff's Chapter 11 Petition (aircraft Nos. 6, 7, 8, and 9) were in derogation of Braniff's rights in violation of the automatic stay set forth in Section 362 of the Bankruptcy Code.

(b) A declaratory judgment is entered in favor of Braniff and against AVSA declaring that AVSA in delivering the A320 aircraft referred to in paragraph 2(a) to GPA Group and/or GPA Leasing in a manner inconsistent with Section 13 of the Partial Assignment violated the automatic stay set forth in Section 362 of the Bankruptcy Code.

3. The Court having determined after a final evidentiary hearing that the Subleases, the BAC1–11 Leases, the Lease Commitment and the September Letter Agreement were not validly terminated, that the rights of Braniff under the Subleases and the Agreements to the extent they relate to the A320s which are the subject of the Partial Assignment are property of the estate, that money damages cannot remedy the damage suffered by Braniff, that Braniff will be irreparably injured if Braniff is deprived of its rights under the Subleases and the Agreements to the extent they relate to the A320s which are the subject of

the Partial Assignment since, without such rights, Braniff will be deprived of property necessary for a successful reorganization; therefore,

(a) Subject to the terms and conditions stated herein, GPA Group, GPA Leasing, and GPA Corp., their officers, agents, servants, employees and attorneys, and persons in active concert or participation with them, are permanently enjoined and restrained from acting in contravention or derogation of Braniff's rights and interests under and to the Subleases and Agreements and the aircraft subject thereto;

(b) Subject to the terms and conditions stated herein, AVSA, its officers, agents, servants, employees and attorneys, and persons in active concert or participation with them, are permanently enjoined and restrained from acting in contravention or derogation of Braniff's rights and interests under and to the Partial Assignment.

(c) Subject to the terms and conditions stated herein, ATL, its officers, agents, servants, employees and attorneys, and persons in active concert or participation with them, are permanently enjoined and restrained from acting in contravention or derogation of Braniff's rights and interests under and to the BAC1–11 Leases between ATL and Braniff.

(d) Subject to the terms and conditions stated herein, with respect to Braniff's rights to the four A320 aircraft that were delivered by AVSA after the filing of Braniff's Chapter 11 Petition, and with respect to the additional A320 aircraft to be delivered by AVSA pursuant to the Partial Assignment:

(i) Braniff and GPA Leasing shall promptly review the form of sublease used for the Subleases to revise such form as necessary to apply to such aircraft, all in accordance with the Lease Commitment.

(ii) (a) As to the four A320s (aircraft Nos. 6 through 9), GPA Leasing (or one of its affiliates) shall deliver such aircraft to Braniff and Braniff may enter into and comply with subleases and related documents on such aircraft under and in accordance with the terms and conditions of such sublease form and the Agreements,

including the Lease Commitment, by December 21, 1989 (or such later date prior to December 31, 1989 as may be mutually agreed among Braniff, GPA Group and AVSA).

(b) As to the other A320s that are the subject of the Partial Assignment, AVSA shall deliver such aircraft in accordance with the Agreements (provided, that GPA Leasing and Braniff shall inspect and accept and AVSA shall deliver on or prior to December 21, 1989 (or such later date prior to December 31, 1989 as may be mutually agreed among Braniff, GPA Group and AVSA) Aircraft No. 10 initially scheduled to be delivered on December 4, 1989 and, provided, further, that GPA Leasing and Braniff shall inspect and accept and AVSA shall deliver A320 aircraft Nos. 11 and 12 by December 21, 1989 (or such later date prior to December 31, 1989 as may be mutually agreed among Braniff, GPA Group and AVSA)). GPA Leasing (or one of its affiliates) shall deliver and Braniff may close on subleases for such aircraft as so delivered in accordance with the Lease Commitment and the form of sublease.

(c) Notwithstanding the foregoing, A320 aircraft which GPA Group or GPA Leasing instructed AVSA to paint as a "whitetail" shall not be unacceptable solely for that reason to Braniff, except that GPA Group and GPA Leasing shall pay for Braniff's cost of painting any such applicable A320 in Braniff's colors and logos if Braniff notifies GPA Leasing that Braniff will operate such A320 under Braniff's colors and logos.

(iii) GPA Group and/or GPA Leasing shall provide Braniff or its authorized agent, representative, successor or assign with an opportunity to inspect and test each of aircraft Nos. 6 through 9, and Braniff shall inspect and test such aircraft, promptly after the date of this Judgment and Final Decree and any such aircraft shall conform to the requirements of the Purchase Agreement and Lease Commitment before Braniff is required to take delivery, except as provided above with respect to whitetails and that the delivery location will not be Toulouse, France.

(iv) GPA Group and/or GPA Leasing shall provide Braniff, for its review and comment, copies of all agreements relevant to Braniff to be entered into in connection with the leveraged lease or similar tax or non-tax financing of each A320 aircraft delivered after the Chapter 11 Petition was filed, including but not limited to, the draft head lease agreements, participation agreements, trust agreements, trust indentures, mortgages or similar agreements, and tax indemnity or indemnification agreements or any comparable documents executed with respect to any non-leveraged lease structure of financing (hereinafter "head lease documents"). Such documents shall be provided to Braniff concurrently with GPA Group's and/or GPA Leasing's distribution thereof to the relevant parties thereto. GPA Group and/or GPA Leasing shall transmit Braniff's comments as to the head lease documents in good faith in their negotiation of the head lease documents to the extent of material changes from the documentation executed in connection with the Subleases if such material changes are contrary to the terms of the Lease Commitment. GPA Leasing and Braniff shall negotiate in good faith as to such material nonconforming changes including those which result from Braniff's filing of its Chapter 11 petition. Subject to the foregoing and to Braniff's rights to accept delivery under the Purchase Agreement of any such aircraft as agent for GPA Group pursuant to the Partial Assignment, GPA Group and/or GPA Leasing or their affiliate(s) may enter into the head lease documents, together with foreign leases, if any, and documents related thereto, regardless of whether or not the relevant aircraft has been delivered to Braniff and regardless of whether or not the relevant sublease has been or is concurrently executed by Braniff.

(v) Notwithstanding anything to the contrary stated above, with respect to future deliveries by AVSA of the A320 aircraft that are the subject of the Partial Assignment, if Braniff does not (a) accept delivery of any such aircraft under the Purchase Agreement as agent for GPA Group or perform any other duty so delegated pursu-

ant to the Partial Assignment agreement, and/or (b) sublease any such aircraft pursuant to and in accordance with the Lease Commitment and the form of sublease, then AVSA and GPA Group, GPA Leasing or its affiliate sublessor shall nevertheless be entitled to close on such aircraft as provided in the Agreements, without the agency of Braniff. In such event, GPA Group and/or GPA Leasing and/or its affiliate sublessor may with notice to Braniff relocate and warehouse any such aircraft.

(vi) The injunction imposed hereby and any applicable stay shall be deemed lifted without further order of this Court if Braniff so fails to take delivery or close on a sublease as provided herein within 60 days from the date of tender of any aircraft by AVSA for an aircraft delivered after the date hereof or within 60 days after December 21, 1989 (or such later date prior to December 31, 1989 as may be mutually agreed among Braniff, GPA Group and AVSA) for any of A320 aircraft Nos. 6 through 9 and GPA Group, GPA Leasing and/or its affiliate sublessor shall be entitled to dispose of and otherwise deal with the A320 aircraft as to which delivery was not so taken or a sublease therefor not closed without further order of this Court and to exercise their rights under the Lease Commitment and at law in courts of general jurisdiction with respect to such aircraft only (and not other aircraft). In order for Braniff to cure with respect to any such aircraft during such 60 day period, Braniff must enter into a sublease thereof in accordance with the terms and conditions of the sublease form and the Lease Commitment within such 60 day period and cure all defaults with respect to such aircraft only (and not other aircraft) within such 60 day period, other than the defaults described in Section 365(e)(1) of the Bankruptcy Code as to Braniff only and not any successor or assignee for so long as Braniff is still subject to the jurisdiction of this Court, as if Braniff had entered into the sublease therefor on delivery or December 21, 1989 (or such later date prior to December 31, 1989 as was mutually agreed as described above), as the case may be, including, without limitation,

payment of rent and other charges from and as of the date of delivery or December 21, 1989 (or such later date prior to December 31, 1989 as was mutually agreed as described above), as the case may be. Notwithstanding the provision for a 60 day period as set forth above GPA Group, GPA Leasing and/or its affiliate sublessor shall have the right to seek relief from this injunction and any applicable stay prior to the passage of such 60 day period.

(vii) In the event there has occurred and is continuing an Event of Default, other than the defaults described in Section 365(e)(1) of the Bankruptcy Code as to Braniff only and not any successor or assignee for so long as Braniff is still subject to the jurisdiction of this Court, under any sublease for A320 aircraft entered into while Braniff is a debtor subject to the jurisdiction of this Court, without further order of this Court, the injunction imposed hereby and any applicable stay shall be deemed lifted so that the applicable sublessor shall be entitled to pursue with respect to the A320 aircraft which is subject to such sublease only (and not other aircraft) all of its rights under the Lease Commitment, any sublease and at law in courts of general jurisdiction.

(viii) Without limiting the availability of additional orders which may be necessary for GPA Group, GPA Leasing or its affiliate sublessors or their financiers, or AVSA or Braniff, on a case by case basis, the execution, delivery and performance by Braniff of all subleases and related documents, including, without limitation, certificates, opinions, lease supplements, side letters, insurance certificates, Buyer Furnished Equipment bills of sale, financing statements, and assignments of sublease consents are hereby ordered, authorized and approved by this Court.

(ix) The entry of this Judgment and Final Decree shall not constitute either an assumption or rejection by Braniff of the Agreements.

(e) Subject to the terms and conditions stated herein, the permanent injunction and order issued under paragraphs 3(a) through (d) shall remain in full force and effect

until lifted or modified by an order of this court or another court of competent jurisdiction.

4. (a) Other than as contained in paragraphs 1, 2 and 3 above, all other relief and claims, including as to conversion and tortious interference, sought in the complaint in the adversary proceeding no. 89–230 are denied and dismissed, each party to bear its own costs.

(b) Judgment is entered in favor of Braniff and against GPA Group, GPA Corp., GPA Leasing and ATL on the counterclaim filed in Adversary Proceeding No. 89–230.

5. GPA Leasing's Motion for Relief from Stay and for Adequate Protection is denied without prejudice to renew at a later date.

6. Braniff's Motion for an Order Authorizing Rejection of A320 Partial Assignment, Assumption, Release and Amendment Agreement is denied without prejudice to Braniff to seek at a later date an order authorizing the assumption or rejection of the Agreements.

7. GPA Group, GPA Corp., GPA Leasing and ATL's Motion to Assume or Reject Executory Contracts Within a Reasonable Time is denied without prejudice to renew at a later date.

8. Notwithstanding anything to the contrary contained in the foregoing, § 1110 of the Bankruptcy Code applies to the BAC1–11 Leases and the Subleases and after the expiration of the § 1110 period the lessors or sublessors thereunder may attempt to exercise their rights and remedies thereunder.

DONE and ORDERED.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This controversy involved the rights of the debtor, Braniff, Inc., to 26 new A320 aircraft under several agreements executed in late 1988. The principal issue in dispute was whether Braniff's rights to the aircraft were validly terminated prior to the September 28, 1989, filing by Braniff of a Chapter 11 petition under the Bankruptcy Code.

The rights in dispute were created in this manner:

As of December 30, 1988, Braniff and AVSA S.A.R.L. ("AVSA") entered into an Amended and Restated Airbus A310/A320 Purchase Agreement dated as of May 1, 1985, as Amended and Restated as of December 30, 1988 "Purchase Agreement". This agreement committed Braniff to purchase 50 new Airbus model A320 aircraft and gave Braniff the option to purchase 50 additional A320s. Contemporaneously, two additional agreements were executed. Braniff, AVSA, and GPA Group Limited, now known as GPA Group PLC (collectively "GPA Group"), entered into a A320 Partial Assignment, Assumption, Release, and Amendment Agreement ("Partial Assignment"), and Braniff and GPA Group entered into an Aircraft Lease Commitment Agreement ("Lease Commitment"). Under the Partial Assignment and Lease Commitment, Braniff assigned to GPA Group its rights under the Purchase Agreement to purchase 26 of the 50 firm aircraft in consideration for GPA Group's commitment to lease those aircraft back to Braniff.[1]

To determine this issue of the validity of the purported prepetition terminations of these rights, the court consolidated several matters for trial on November 20, 21, 22, 24, and 25, 1989. The matters were:

(a) Adversary Proceeding No. 89–230 filed in this Chapter 11 case by Braniff, as plaintiff, against GPA Group; GPA Corporation; GPA Leasing USA I, Inc.; Wilmington Trust Company; AVSA, S.A.R.L.; and Air Tara Limited; as defendants, and including the counterclaim of GPA Group PLC; GPA Leasing USA I, Inc.; and Air Tara Limited against Braniff;

---

1. All of the matters before the court relate to the rights with regard to the 26 GPA aircraft. The rights of the parties with respect to the other 24 firmly ordered A320 aircraft and the 50 option aircraft are the subject of a separate motion by AVSA for relief from stay and other relief (Document No. 251A, S–16) that was determined by the entry of an order on March 2, 1990 (Document No. 882).

(b) The motion filed in the main case by GPA Leasing USA I, Inc., for relief from the automatic stay and for adequate protection (Document No. 77, S–4);

(c) The motion filed in the main case by Braniff for an order authorizing rejection of the Partial Assignment (Document No. 306E); and

(d) The motion filed in the main case by GPA Group, GPA Leasing USA I, Inc., GPA Corporation, and Air Tara, Limited, to Require Braniff to Assume or Reject Executory Contracts Within a Reasonable Time (Document No. 395A).

Because of the need of the parties for an immediate decision, after the completion of the testimony and evidence the court announced its decision and dictated into the record preliminary findings of fact and conclusions of law. The court further stated that it would enter written, final findings of fact and conclusions of law as soon as the court's calendar would permit their preparation. In the meantime (and based upon the preliminary findings and conclusions), the court entered its judgment and final decree on December 12, 1989 (Document No. 494 in the main case; Document No. 76 in the adversary proceeding). The court therefore intends these findings and conclusions to substitute for the oral, preliminary ones that were originally dictated.

## FINDINGS OF FACT

1. Braniff, Inc., filed for relief under Chapter 11 of the Bankruptcy Code at 1:35 a.m. on September 28, 1989. Braniff is in possession of its assets and is operating as debtor-in-possession.

2. Several hours before the petition was filed, Braniff received facsimile transmissions from defendants, GPA Group, GPA Leasing USA I, Inc. ("GPA Leasing"), and Air Tara Limited ("ATL"), purporting to terminate Braniff's rights in and to the 26 aircraft. The notices of termination stated that the respective defendants understood that Braniff was in default of unspecified provisions of the underlying agreements.

3. Originally, Pan American World Airways, Inc. ("Pan Am"), held the rights to the 26 aircraft. In 1985, AVSA and Pan Am entered into the Airbus A310/A320 Purchase Agreement, as subsequently amended, supplemented or otherwise modified, dated May 1, 1985 (the "Original Purchase Agreement"), pursuant to which AVSA agreed, among other things, to sell to Pan Am 16 and, at Pan Am's election, an additional 34 Airbus model A320 aircraft, each including IAE V–2500 jet engines. (AVSA is the sales subsidiary of the aircraft's manufacturer, Airbus Industrie G.I. E.). Pan Am wanted to divest itself of its rights and obligations under the Original Purchase Agreement with respect to the A320s. AVSA and IAE agreed to permit this and to provide to Pan Am consideration in the approximate amount of $115 million, plus other concessions in the approximate amount of $60 million.

### The Agreements

4. As of December 30, 1988, AVSA and Braniff entered into the Purchase Agreement pursuant to which Braniff received an assignment of Pan Am's rights to purchase the A320 aircraft under the Original Purchase Agreement, exercised the option to convert the 34 option A320 aircraft to firmly ordered A320s, and received an option for an additional 50 A320 aircraft.

5. At the closing, as of December 30, 1988, AVSA, GPA Group, and Braniff entered into the Partial Assignment, and Braniff and GPA Group entered into the Lease Commitment. The purpose of the Partial Assignment and Lease Commitment was to enable Braniff to obtain possession of 26 of the A320 aircraft under the Purchase Agreement.

6. Under the Partial Assignment, and in connection with it, GPA Group received $7,800,000 from Braniff and $7,800,000 from AVSA.

7. At the closing as of December 30, 1988, Braniff and Pan Am entered into an A320 Buyer Furnished Equipment Agreement Assignment, pursuant to which, among other things, Pan Am assigned to Braniff its rights and obligations under

certain purchase orders and agreements for certain buyer furnished equipment for the A320s.

8. Pursuant to the terms of the Purchase Agreement, the Partial Assignment, and the Lease Commitment, five A320 aircraft were sold, leased, and subleased between July 13, 1989, and September 25, 1989.

9. The five A320 transactions were leveraged lease transactions, each of which included a foreign element known as a Japanese Double Dip. Pursuant to the Japanese Double Dip, each aircraft was sold to a Japanese entity which was, in turn, entitled to receive tax credits in Japan by reason of the Japanese entity's ownership of the aircraft. Additionally, through a complicated set of transactions, Wilmington Trust Company ("Wilmington"), as Owner–Trustee, became the owner of each A320 aircraft for United States tax purposes. Wilmington then entered into leases for each of the five A320 aircraft with GPA Leasing which then subleased each of the aircraft to Braniff pursuant to the Lease Commitment.

10. It was commonly known in the aircraft lease financing community that the type of Japanese Double Dip transactions being undertaken by GPA would not provide tax credits to the Japanese entities participating in the transactions if they were entered into after September 30, 1989. GPA Group was aware of this fact.

11. The closing of the sale, lease, and sublease of the first A320 occurred on July 13, 1989. Wilmington was the Owner–Trustee acting on behalf of Pitney Bowes Credit Corporation, the owner participant. Wilmington leased the A320 to GPA Leasing pursuant to an Aircraft Lease Agreement dated as of July 13, 1989. Pursuant to the terms of the Lease Commitment, GPA Leasing subleased the A320 to Braniff pursuant to an Aircraft Sublease Agreement, dated as of July 13, 1989.

12. The closing of the sale, lease, and sublease of the second A320 occurred on September 1, 1989. Wilmington was the Owner–Trustee acting on behalf of Chrysler Capital Corporation, the owner partici-

pant. Wilmington leased the A320 to GPA Leasing pursuant to an Aircraft Lease Agreement dated as of August 30, 1989. Pursuant to the terms of the Lease Commitment, GPA Leasing subleased the A320 to Braniff pursuant to an Aircraft Sublease Agreement, dated as of August 30, 1989.

13. The closing of the sale, lease, and sublease of the third A320 occurred on September 6, 1989. Wilmington was the Owner–Trustee acting on behalf of Chrysler Capital Corporation, the owner participant. Wilmington leased the A320 to GPA Leasing pursuant to an Aircraft Lease Agreement dated as of September 5, 1989. Pursuant to the terms of the Lease Commitment, GPA Leasing subleased the A320 to Braniff pursuant to an Aircraft Sublease Agreement, dated as of September 5, 1989.

14. The closing of the sale, lease, and sublease of the fourth A320 occurred on September 20, 1989. Wilmington was the Owner–Trustee acting on behalf of Chrysler Capital Corporation, the owner participant. Wilmington leased the A320 to GPA Leasing pursuant to an Aircraft Lease Agreement dated as of September 20, 1989. Pursuant to the terms of the Lease Commitment, GPA Leasing subleased the A320 to Braniff pursuant to an Aircraft Sublease Agreement, dated as of September 20, 1989.

15. The closing of the sale, lease, and sublease of the fifth A320 occurred on September 25, 1989. Wilmington was the Owner–Trustee acting on behalf of Chrysler Capital Corporation, the owner participant. Wilmington leased the A320 to GPA Leasing pursuant to an Aircraft Lease Agreement dated as of September 22, 1989. Pursuant to the terms of the Lease Commitment, GPA Leasing subleased the A320 to Braniff pursuant to an Aircraft Sublease Agreement, dated as of September 22, 1989. (The Subleases for A320 number 1 through number 5 are collectively referred to as the "Subleases," and the Aircraft Lease Agreements are referred to as "Head Leases").

16. Lease Supplements and Sublease Supplements were entered into with respect to each of the five closings. The

Lease Supplements provide the schedule under which the lessee, GPA Leasing, must pay rent under the head leases. The Subleases each provide that execution by the sublessor of the Sublease Supplement is conclusive evidence of a waiver by the sublessor of conditions precedent to the closings, except as otherwise provided at the closings.

### The Parties' Course of Conduct

17. Jeffrey Chodorow is a principal of BIA–COR Holdings, Inc., Braniff's parent corporation. Prior to the filing of the petition, Chodorow was a consultant to Braniff. After the petition was filed, Chodorow was appointed vice chairman of Braniff.

18. GPA Group's involvement with Braniff began in June, 1988. At that time, GPA Group entered into transactions with Braniff involving the sale and leaseback of 12 BAC 1–11 aircraft and the future purchase of 12 Fokker–100 aircraft.

19. In June, 1988, GPA received stock acquisition rights from Braniff which entitled GPA to receive a ten percent equity interest in Braniff at a future date.

20. GPA Group's involvement in the A320 transaction with AVSA arose as a result of Braniff asking GPA Group if it was interested in participating in the transaction as Braniff's financial partner. Prior to that time, GPA Group had unsuccessfully sought to acquire Pan Am's rights under the Original Purchase Agreement, but AVSA did not want the A320 aircraft to be transferred to an aircraft leasing company. AVSA wanted an airline to receive the aircraft.

21. From at least December, 1988, Braniff continuously provided GPA Group with financial information concerning Braniff's operations and financial results. Braniff held board of directors meetings to which GPA Group was invited, and Braniff provided GPA Group with monthly financial information. GPA Group was kept well informed of Braniff's deteriorating financial condition.

22. The Subleases for A320 aircraft 1, 2, and 3 accurately set forth Braniff's operating losses and net losses.

23. Braniff also provided GPA with Braniff's Form 10Q for the quarter ending April 30, 1989, and Braniff's Form 10Q for the quarter ending July 31, 1989, both of which showed that Braniff was suffering substantial losses and that Braniff's financial condition was continuing to deteriorate. GPA Group analyzed the financial information received from Braniff.

24. In early August, 1989, Chodorow began discussions with Colm Barrington and Brian Foley, both officers of GPA Group, concerning a proposed global agreement intended to settle certain outstanding issues about the restructuring of the Braniff fleet plan and Braniff's financial needs. For example, the parties contemplated both the early replacement of the BAC 1–11s because of their high operating costs and the infusion of critical funds for Braniff to stabilize its financial condition. GPA Group committed itself to finding the financing for Braniff, which the parties contemplated would exceed $75 million. At one of the meetings on the global transaction, Braniff let GPA Group and others know that Braniff might consider filing a petition under the Bankruptcy Code if certain obligations were not deferred.

25. The global transaction which the parties began discussing in early August, 1989, was memorialized in writing in a letter agreement dated September 1, 1989, among GPA Group, GPA Fokker 100 (N.A.) N.V. ("GPAF"), Air Tara Limited ("ATL"), and Braniff (the "September Letter Agreement"). The September Letter Agreement deferred the time when the BAC 1–11 September rent of approximately $860,000 was due and contemplated the extinguishment of a $1 million obligation relating to placing hushkit equipment on the BAC 1–11s.

26. The September Letter Agreement stated that its terms would be incorporated in a master or global agreement. The GPA Group board approved the master agreement in principle, although it required some "fine tuning" that the parties in fact worked toward. The September Letter Agreement further provided that the parties anticipated that the master agreement

would be executed on or before September 20, 1989.

27. The parties to the September Letter Agreement believed the September 20 date to be an unrealistic target for completion of the master agreement. The September 20 date was intended to encourage the parties to work more quickly to finalize the master agreement.

28. From September 1 through September 27, 1989, efforts were made by GPA Group and Braniff to carry out the terms of the September Letter Agreement and to close the master agreement.

29. On September 14, 1989, Colm Barrington wrote to Chodorow concerning the progress being made to accomplish the global transaction following GPA Group's executive committee meeting and board of directors meeting. Barrington wrote at page 3:

We have a significant documentation task to complete. Subject to agreement of the outstanding issues as set out above we will devote the required resources to complete as soon as possible. [PX–20].

30. On September 15, 1989, Barrington wrote to Chodorow concerning the outstanding amounts then due by Braniff for deposits under a purchase agreement for the Fokker–100 aircraft and for maintenance due on the BAC 1–11 aircraft totalling $625,000 ("625,000 Amount").

31. Both Barrington and Chodorow discussed entering into an agreement under which Braniff would satisfy the obligations for the 625,000 Amount in three installments to be paid in connection with the fourth, fifth, and sixth A320 closings.

32. Chodorow and Barrington spoke to each other on several occasions from September 20 through September 25, 1989, concerning various aspects of the global transaction. All of the parties, up through September 27, 1989, moved forward to complete the global transaction.

33. On September 25, 1989, International Aero Engines ("IAE"), the manufacturer of the V–2500 jet engines to be supplied with the A320s, wrote to Gerald Broker of BIA–COR Holdings, Inc., concerning the conditions under which IAE would be willing to give Braniff financial accommodations to help the effort undertaken in the global transaction. Barrington received a copy of this letter from Broker by telecopy on September 25, 1989.

34. On September 27, 1989, in furtherance of the global transaction discussed in the September Letter Agreement, Barrington wrote to IAE to express his concerns about the Braniff situation. He wrote:

The nearest parallel I can think of to this transaction is that of a slow bicycle race—each party trying to stay behind the other! I fear however that if we don't all step up the pace then Braniff will be the party that topples.

\* \* \* \* \* \*

As regards the new financing there is the possibility of putting together a package totalling approximately $150 Million. This is made up as follows ...

[PX–26].

### Banque Paribas

35. GPA Group contacted Banque Paribus to attempt to obtain financing for Braniff under the global transaction.

36. On September 7, 1989, Banque Paribas communicated its interest in underwriting the financing transactions that GPA Group had been discussing for Braniff.

37. On September 19, 1989, Banque Paribas communicated to GPA Group that it was willing to underwrite the full amount of the Braniff A320 pre-delivery payment loan and the premium loan, subject to documentation. Barrington received the bank's correspondence on September 20 and did not think the transaction would close on that day.

38. GPA Group made an effort to expedite the documentation task necessary to obtain the financing by suggesting that Banque Paribas use Credit Lyonnais' counsel to prepare the loan documents, but Banque Paribas declined to do so.

39. It was not until September 28, 1989, after Braniff filed its petition, that GPA Group told Banque Paribas that GPA

Group would not be going forward with the financing for the global transaction.

### Aircraft Closings

40. On September 19, 1989, Braniff advised GPA Group that it might not be in a position to satisfy the conditions precedent to the fourth closing because Braniff's negative net worth had fallen below $25 million, thereby causing possible net worth requirement defaults under two credit agreements. According to Foley's letter to Barrington on September 19, 1989, Braniff asked GPA Group to waive the cross-default condition precedent. Foley wrote:

> Unless we are prepared to halt all deliveries until a thorough credit review can be accomplished, my recommendation is that once we have the precise language of a proposed waiver request we accept for this and the other September aircraft ... [and conduct] a full scale review of their [Braniff's] financial structure prior to any October deliveries ...

[PX–27].

41. Bonnie Dixon, an attorney at the law firm of Breed, Abbott & Morgan, was primarily responsible for negotiating the subleases and other closing documents for the A320 aircraft closings on behalf of Braniff. John P. Howitt, an attorney at the law firm of Paul, Hastings, Janofsky & Walker, was GPA Group's counsel primarily responsible for the A320 transactions.

42. Two documents were negotiated as part of the fourth A320 aircraft closing that had not been necessary at the prior three closings: a waiver letter ("Waiver Letter") and an extension letter ("Extension Letter").

43. The Extension Letter, which was drafted by Gerald Broker, a principal of BIA–COR, provided that among other things, the date for the global or master agreement under the September Letter Agreement would be extended until October 1, 1989, the 625,000 Amount would be paid in three installments corresponding with the closings on aircraft 4, 5 and 6, and certain other payments would be reset for October 1, 1989.

44. Dixon negotiated the Extension Letter and Waiver Letter with Howitt on September 20, 1989, in several telephone conversations during the course of the day. Initially, when she asked Howitt if the Extension Letter comported with his understanding of what GPA Group and Braniff had agreed to, he said he thought so, but would have to confer with his client. The only change that Howitt subsequently requested be made to the Extension Letter involved which GPA corporate officer would sign the Letter. When Dixon asked Howitt if she could obtain executed copies of the Waiver and Extension Letters before the closing, Howitt said that the signatories could not be reached that day.

45. On September 20, 1989, during the last telephone conversation prior to the closing on the fourth A320 aircraft, Dixon asked Howitt "if the business deal was fixed." It was plainly understood by both Howitt and Dixon that Dixon was asking whether there was agreement on the terms of the Waiver and Extension Letters, in that it was those letters which they had been negotiating. Howitt replied "yes," and Dixon authorized the fourth closing to proceed.

46. Neither Howitt nor any GPA Group, ATL, GPA Leasing, or GPAF representative ever told Dixon that the Extension Letter or Waiver Letter were unacceptable.

47. It was Dixon's understanding that the Waiver Letter and Extension Letter had been agreed to and would be executed after the closing by the appropriate GPA companies.

48. Braniff paid, and GPA Group or its affiliate accepted, the first installment payment of the 625,000 Amount of $208,000, in connection with the fourth closing.

49. Dixon submitted the same form of waiver letter ("Second Waiver Letter") and extension letter ("Second Extension Letter") for the fifth closing. Neither Howitt nor any representative of GPA Group, ATL, GPA Leasing, or GPAF ever told Dixon that the Second Waiver Letter or Second Extension Letter were unacceptable. It was Dixon's understanding that the Second Extension and Waiver Let-

ters had been agreed to and would be executed in connection with the closing.

50. The closing on the fifth plane took place on September 25, 1989. In connection with that closing, Braniff paid, and GPA Group accepted, the second installment of the 625,000 Amount.

51. The parties all intended that the third installment for the 625,000 Amount would be paid in conjunction with the sixth A320 aircraft closing.

52. On September 27, 1989, a pre-closing was held for the sixth aircraft closing. (The closing itself was scheduled for September 28, 1989.) At the pre-closing, Breed, Abbott & Morgan, on behalf of Braniff, submitted forms of a waiver letter and extension letter for the sixth closing substantially similar to the forms used at closings four and five. One of the purposes for a pre-closing is to allow the parties to comment and object to the terms of the documents. Neither Howitt nor any representatives of GPA Group, ATL, GPA Leasing, or GPAF informed Dixon that the extension or waiver letters were unacceptable.

53. It is a custom and practice among counsel in the aircraft leasing community to inform other counsel if documents submitted for a closing are unacceptable.

54. None of the executed closing documents for aircraft closings four and five were provided to Braniff or Breed, Abbott & Morgan until weeks after the Chapter 11 petition was filed by Braniff. Although the waiver letters for closings four and five were executed by GPA Leasing, the GPA Group companies had not executed the extension letters.

*Termination Notices*

55. On September 27, 1989, in the afternoon, Colm Barrington and Brian Foley heard from various sources that Braniff was about to file for bankruptcy. Thereafter Barrington and Foley had a meeting with GPA Group's lawyers at Paul, Hastings, Janofsky & Walker in New York.

56. On September 27, 1989, at approximately 9 o'clock p.m., several hours before Braniff filed its Chapter 11 petition, after Barrington and Foley met with GPA Group's attorneys, GPA sent notices of termination to Braniff by facsimile transmission as follows:

(a) notices of termination dated September 27, 1989, from GPA Leasing to Braniff in connection with the Aircraft Sublease Agreements for GPA 1989 BN–1 through BN–5, the first five aircraft;

(b) a notice of termination dated September 27, 1989, from GPA Group and GPA Leasing to Braniff in connection with the Aircraft Lease Commitment dated as of December 30, 1988;

(c) a notice of termination from ATL to Braniff in connection with the Aircraft Lease Agreements between ATL and Braniff for the BAC 1–11 200 series aircraft; and

(d) a letter dated September 27, 1989, from ATL, GPA Group, and GPAF to Braniff confirming the expiration of the September Letter Agreement.

57. The September 27 termination letters did not specify what Braniff's purported defaults were. After the Chapter 11 petition was filed, Barrington for the first time informed Braniff of the alleged defaults which, in GPA Group's view, entitled GPA Group and its affiliates to terminate Braniff's rights in the 26 aircraft and related agreements. Barrington explained that the defaults were that:

(a) Braniff failed to make the first of its maintenance accrual payments in the approximate amount of $30,000 when due to GPA Leasing with respect to the first sublease dated July 13, 1989;

(b) Braniff was unable to, and actually failed to, pay its debts generally as they came due;

(c) Braniff failed to pay amounts in excess of $2 million when due to GPA Leasing and its affiliates (as defined in the Lease Agreements) under leases and other applicable agreements, thereby resulting in an "Event of Default" under Section 17(i) of the Lease Agreements. This amount was allegedly comprised of $860,000 for BAC 1–11 rent due September 1, 1989, $1

million for placing hushkit equipment on BAC 1–11s, $30,000 for the first sublease maintenance accrual, and $208,000 for the last installment of the 625,000 Amount;

(d) Braniff made representations and warranties with respect to, among other things, the absence of "Events of Default", or conditions or events which with notice or the passage of time or both would constitute an "Event of Default", concerning its financial condition, and certain title warranties, which representations were incorrect at the time made or deemed remade; and

(e) Braniff took corporate action in furtherance of a voluntary reorganization proceeding.

58. Contrary to GPA Group and its affiliates' contentions, prior to Braniff's filing of the Chapter 11 petition on September 28, 1989, Braniff was not in default under the Subleases, the Lease Commitment, or any other agreements, and the September Letter Agreement had not expired.

59. Contrary to GPA's allegations, Braniff was not in default for failing to make the first of its maintenance accrual payments in the approximate amount of $30,000 when due to GPA Leasing with respect to the first lease agreement dated July 13, 1989. By reason of several discussions that took place between Brian Foley, GPA's representative, and William Mayville, Braniff's representative, from on or about September 20, 1989, through September 27, 1989, GPA waived and modified the obligation as an event of default and agreed and acknowledged that the failure to make the payment was immaterial. Additionally, Braniff had been attempting to collect a past due obligation from GPA Group in excess of $490,000. Braniff and GPA Group had agreed that they would work together to have the obligation paid. At the time of the petition, GPA Group had not paid the obligation.

60. Contrary to GPA's allegation, Braniff was not unable to pay its debts generally as they came due. Braniff was currently making payments on outstanding obligations, such as financing obligations and lease payments, payroll, and trade obli-

gations, although in some cases, they were being delayed. Additionally, Barrington and Foley, two GPA principals, were aware for some time that Braniff was encountering substantial cash flow problems. Notwithstanding this knowledge, GPA closed on five A320 aircraft from July 13, 1989, through September 25, 1989, and was preparing to close on the sixth A320 aircraft during the pre-closing on September 27, 1989. Although Barrington testified about information he received regarding suppliers refusing to deliver product to Braniff, this information was not of sufficient degree to constitute a default under the agreements.

61. Contrary to GPA's assertion, Braniff was not in default of its obligations to GPA Leasing and its affiliates by failing to pay amounts in excess of $2 million to such entities as of the date of the filing of the petition.

62. The September 20 date in the September Letter Agreement was only an anticipated or target date for the master agreement to close, and the parties knew it was unrealistic to actually close the master agreement then.

63. The September 20 date was extended to at least September 30, 1989, by GPA and its affiliates by express agreement and by agreement evidenced by the parties' conduct. GPA and its affiliates agreed to the terms of the Extension Letter and the Second Extension Letter as part of the closing documents on the fourth and fifth aircraft closings which occurred on September 20 and 25, 1989. During the period between September 1 and September 27, 1989, GPA and its affiliates took steps to carry out the terms of the September Letter Agreement and the Extension Letters by, among other things, negotiating and working to finalize financing terms for Braniff with Banque Paribas, arranging to obtain equity investors for aircraft closings after the sixth A320 closing, negotiating with IAE to have IAE provide Braniff with certain financial accommodations contemplated by the September Letter Agreement, closing on the second through the fifth A320 aircraft and preparing to close on the

sixth aircraft, and arranging for Braniff to pay, in three installments, the 625,000 Amount. One of the provisions in the Extension Letters was that, in connection with a fourth, fifth, and sixth A320 closings, Braniff would pay one-third of the outstanding 625,000 Amount. These amounts were paid at the fourth and fifth closings.

64. Contrary to GPA's allegations, Braniff was not in default of its obligations to GPA and its affiliates for making representations and warranties with respect to, among other things, the absence of "Events of Default", and conditions or events which with notice or the passage of time or both would constitute an "Event of Default", in connection with its financial condition, and certain title warranties.

65. From at least December 1988 through September 27, 1989, GPA's principals, Barrington and Foley, were provided with extensive and accurate financial information regarding Braniff and were well aware of Braniff's poor financial performance and prospects. Additionally, the written representations set forth in the Subleases executed in connection with the five closings on the A320 aircraft from July 13, 1989, through September 25, 1989, and in the Waiver Letter and Second Waiver Letter, accurately represented the financial condition and performance of Braniff.

66. Braniff was not in default of any of its obligations to GPA or its affiliates for "taking corporate action in furtherance of a voluntary reorganization proceeding."

67. GPA Group and its affiliates had been advised by Braniff during the global transaction discussions that filing a Chapter 11 proceeding was a possibility. The GPA companies were well aware of Braniff's deteriorating financial condition, and no significant change occurred on September 27, 1989. Accordingly, the actions by Braniff's board of directors on the afternoon of September 27, 1989, in authorizing the filing of a petition for reorganization is not available to GPA Group as an event of default and does not constitute a valid ground for terminating Braniff's rights under the A320 leases or any other agreement.

68. On September 27, 1989, GPA and its affiliates made a determination to attempt to terminate the subleases on the five A320 aircraft, the Lease Commitment, and the BAC 1–11 Leases solely based on GPA and its affiliates' belief that Braniff was about to file a petition under Chapter 11 of the Bankruptcy Code.

69. The Purchase Agreement, Partial Assignment, and Lease Commitment were intended to be a unified agreement resulting in the delivery of 26 airplanes to Braniff. Not until September 29, 1989, the day after Braniff's Chapter 11 filing, did the GPA Group purport to give notice to AVSA under the Partial Assignment that the GPA companies had given notice to Braniff of the purported termination of the Lease Commitment.

### Post–Petition Conduct Of Defendants

70. After the petition was filed, GPA Group, GPA Leasing, and AVSA closed on aircraft 6, 7, 8 and 9 without Braniff's participation. These defendants conducted the closings and aircraft deliveries as if Braniff's rights under the Lease Commitment, Partial Assignment, and September Letter Agreement had been terminated on September 27, 1989.

71. After the petition, GPA Group and AVSA had discussions with various airlines that inquired about the availability of the 26 aircraft.

72. After the petition was filed, Braniff itself, and through its authorized representatives, had discussions with airlines and others who expressed some interest in participating in a reorganization effort that would involve the A320 aircraft and/or in acquiring rights in the A320s.

73. GPA Group's position that Braniff's rights in the 26 aircraft had been terminated prior to the petition quickly spread through the aviation industry and, as a practical matter, made it difficult to inspire interest by third parties in the aircraft. Marketing the 26 aircraft was difficult because a cloud existed on their title.

74. Although Braniff is not presently using the A320 aircraft in its operations, there are sufficient qualified personnel available to Braniff to do so.

*Valuation of Aircraft*

75. The A320 aircraft are extremely valuable assets to the estate. Although at the time of trial Braniff's plans for the A320 aircraft had not been formulated, Braniff may use the aircraft in future operations under a plan of reorganization or may attempt to transfer its rights to such aircraft to obtain critical funds for its reorganization. Without the aircraft, Braniff's ability to reorganize will be frustrated. Contrary to GPA's contentions, Braniff has significant equity in the Subleases. If Braniff loses its protected rights to the 26 A320 aircraft with the earliest delivery positions, Braniff may well be unable to reorganize. Braniff intends to either sell, lease, operate, or otherwise obtain value from the A320 aircraft for the reorganization effort.

76. The aircraft are being properly maintained and they are not depreciating in value.

77. Pan Am received over $160 million for the rights that it had to 16 firm and 34 option A320 aircraft. GPA Group found the rights in the 26 firm aircraft to be valuable, and GPA Group expected to make a large profit from the transaction. In fact:

(a) GPA Group expected profit of at least $130 million on the A320 transactions, excluding rent from the Braniff Subleases.

(b) At each aircraft closing, GPA was to receive two "uplifts" totalling in excess of $7,400,000. These uplifts are profit to GPA Group or its affiliates. One uplift was received with respect to the sale of each A320 to the Japanese entity in the Japanese Double Dip and the other involved the sale of each A320 to Wilmington. In addition, GPA Group and its affiliates expected to profit from tax credits generated by the transactions.

(c) GPA Leasing was not required to make any payments under the Head Leases to Wilmington until at least August, 1990. Once the payments by GPA Leasing begin, they will be substantially less than the payments that Braniff is required to make to GPA Leasing under the Subleases.

(d) Barrington sent a letter to Banque Paribas on August 29, 1989, concerning the financing that the Bank was being asked to undertake on behalf of Braniff under the global transaction later evidenced by the September Letter Agreement. In the letter, GPA said it was comfortable with the A320 aircraft fair market value appraisals at $38 million and represented that there was sufficient value in each plane, in excess of the purchase price, to support the amount of the loan being requested from Paribus. After Barrington made his observations in the August 29, 1989, letter, Banque Paribas agreed to underwrite the loans to Braniff contemplated by the global transaction outlined in the September Letter Agreement.

(e) The financing to Braniff contemplated by the global transaction was, in part, to be secured by assignments of rights to the A320 aircraft, and Barrington represented to Banque Paribas that there was at least $4 million of value in each aircraft in excess of the purchase price from AVSA. One of the conditions precedent to the loan closing was an appropriate appraisal, and there is nothing in the record that suggests that such an appraisal would not have been obtained.

78. Fair market value appraisals of the A320 aircraft required by some parties to the A320 aircraft closings stated that each A320 was worth $38 million.

79. Based upon the expert testimony on valuation, Braniff has substantial equity in the 26 aircraft that are the subject of the Partial Assignment.

(a) The expert witnesses who testified as to value on behalf of each of the parties were:

(i) Lewis Simon on behalf of Braniff;

(ii) William Bath and James Fantacci on behalf of GPA Group, GPA Leasing, GPA Corp., and ATL;

(iii) Uli Baur on behalf of AVSA.

(b) Although each expert testified as to what he believed the value of the A320 aircraft subject to the Partial Assignment was, the experts' testimony did not provide an adequate basis upon which to quantify the precise value of each aircraft to the estate. Nevertheless, the expert testimony taken together showed that there is substantial value to the estate in these aircraft because there is a demand for A320 aircraft and the A320s to which Braniff has rights represent a large stream of A320 aircraft to be delivered over time in the same configuration, including a large block of early delivery positions.

(c) The V–2500 engines to be included in each A320 aircraft are a major factor of value. Although the V–2500 is relatively new, it has been well received in other parts of the world. The engine is state-of-the-art, is fuel efficient, and more environmentally safe than many aircraft engines presently in use. Additionally, Delta Airlines has recently placed an order for V–2500 engines for over 100 of its new MD–90 aircraft. This order constitutes a major development because of the engine's acceptance by the industry that it represents.

(d) There is a continuing demand for A320 aircraft. Although Bath testified on behalf of GPA Group that there is an overabundance of narrow-bodied aircraft available on the market, there is no dispute but that Airbus Industrie G.I.E. itself intends to continue and increase production of the A320 aircraft. In arriving at his conclusion, Bath was selective in what material he used. He relied on certain information from the manufacturers that he said tended to show an overabundance of narrow-bodied planes, but he ignored the manufacturers' material on how many planes were going to be retired. Bath's testimony must therefore be discounted.

(e) The 26 aircraft involved in this dispute are part of a stream of 50 firmly ordered and an additional 50 option aircraft. There is no large block of the same configuration of this or comparable aircraft available from any manufacturer. The availability of a limited number of A320s or of comparable aircraft available from other leasing companies does not substantially diminish the value that exists in the large stream of A320 aircraft available to Braniff.

(f) Baur's testimony that an airline like Braniff in a Chapter 11 proceeding cannot realize value in a sale of A320 aircraft or A320 aircraft rights was contrary to the weight of the evidence on value. Additionally, Baur overlooked several factors. For example:

(1) Baur testified that Braniff would be unable to market the aircraft effectively. However, AVSA, GPA Group, and Braniff's rights in the A320 aircraft subject to the Partial Assignment are intertwined, and AVSA and GPA Group, as well as Braniff, have an interest in preventing losses. Nothing in the record indicates that the AVSA and GPA Group would refuse to cooperate to the extent necessary to provide technical assistance that might be required to market the rights to the aircraft. In fact, it would be in GPA Group's self interest to consent to modifications that would eliminate some of the undisputedly onerous features of the Subleases based upon the creditworthiness of a new sublessor.

(2) Baur overlooked various options that Braniff has to reorganize. Braniff has had discussions and has been considering various alternatives with respect to its reorganization efforts. Some discussions were held to consider a joint venture with a leasing company or another similar company with leasing experience. Discussions were also held with respect to recapitalizing and using some of the A320 aircraft in a new operation.

(g) Simon testified, on behalf of Braniff, that the value of the A320 aircraft can and should be viewed as a package, i.e., the 50 firm and 50 option A320s under the Purchase Agreement. The aircraft subject to the Subleases (and to subleases in the future) together with the 24 aircraft and 50 option A320s that Braniff is to buy directly has substantial value as a package. The total package has a value up to in excess of $125 million.

(h) Based on the testimony of the expert witnesses and other evidence of value presented at the trial, it is impossible to quantify precisely the value of the A320 aircraft or the rights to those aircraft. There is, however, ample evidence showing that there is substantial value for Braniff and the estate that can be realized in the 26 aircraft subject to the Partial Assignment, whether valuing the 26 aircraft in isolation, or valuing the 26 aircraft as part of the entire package of 100 under the Purchase Agreement.

(i) GPA Group and its affiliates will not be unfairly prejudiced by providing Braniff with an opportunity to formulate an effective method of utilizing the A320s in a reorganization.

(1) The timing of GPA Leasing's payments to Wilmington under the Head Leases is deferred for a substantial period of time so that, although the GPA companies' balance sheet may be impacted in the short run, its cash flow is not substantially impacted.

(2) There is a substantial rental differential between the rent that GPA Leasing receives under the subleases to Braniff and the rental payments made or to be made by GPA Leasing to Wilmington.

(3) GPA Group and GPA Leasing receive a substantial amount of investment tax credit from the United States side of the leveraged lease transactions that provides an immediate benefit to GPA Group and lowers the price that is passed on to Wilmington.

(4) There is an immediate cash benefit to GPA Group or its affiliates from the Japanese Double Dip uplift, as well as from the uplift that occurs from the sale of the aircraft to Wilmington for a price in excess of the AVSA purchase price.

(5) The aircraft being held by Braniff (aircraft 1 through 5) are and have been properly maintained and have not deteriorated in value. Additional aircraft of which Braniff may not take immediate delivery will remain in the possession, custody, and control of GPA Group or an affiliate, and presumably such entities will properly maintain the aircraft.

(j) The steady stream of A320 aircraft, all with a common configuration and state-of-the-art engines, including the aircraft with early delivery dates, is a valuable asset of the estate, and the estate has substantial equity in the aircraft and aircraft rights that are the subject of the Lease Commitment and Partial Assignment.

(k) The A320 aircraft subject to the Partial Assignment are necessary for an effective reorganization.

(*l*) Although there is a continuing demand for A320 aircraft and the stream of aircraft rights to which Braniff is entitled have a substantial value, there are a limited number of buyers and lessees of such aircraft in the world. Some lead time is required, therefore, to provide for a sale or other disposition of the rights in the aircraft by Braniff.

### Cloud on the Title

80. GPA Group, GPA Leasing, and ATL wrongfully attempted to terminate the Sublease and the Lease Commitment, as well as Braniff's rights to the aircraft.

81. During the 60–day period between the date of the filing of the Chapter 11 petition and the conclusion of the trial of this dispute, there was a cloud on Braniff's right, interest, and title to the A320 aircraft. This cloud hampered Braniff's ability to use the aircraft in its reorganization efforts.

82. As a result, additional burdens have been placed on Braniff to find a precise use for the rights in the A320s, especially since it was well known in the aviation industry that GPA Group mightily contested Braniff's rights. Indeed, third parties raised questions about Braniff's ability to transfer rights in the aircraft when GPA Group and its affiliates vigorously contested those rights.

83. Although Braniff would have had difficulty finding uses for and marketing some of the A320 aircraft subject to the Partial Assignment even in the absence of the improper notices of termination sent by GPA Group and its affiliates prior to the

Chapter 11 petition being filed, the additional burden of having to litigate vigorously Braniff's rights in the A320s with GPA Group has imposed a substantial additional hardship on Braniff with respect to its reorganization efforts.

84. Braniff requires additional time in arranging, proposing, and confirming a reorganization plan, free of the restraints and clouds on title caused by GPA Group, GPA Leasing, and ATL's conduct. Without such additional time, it will be unlikely that Braniff will be able to effect a successful reorganization.

85. Money damages will not remedy the wrongful conduct of GPA Group and its affiliates.

86. Braniff has been irreparably injured by the conduct of GPA Group, GPA Leasing, ATL, and any affiliates, and their officers and employees who participated in such conduct, in that Braniff has been deprived of property necessary for an effective reorganization and has been frustrated in its attempt to reorganize.

87. The harm to Braniff as a result of the improper termination, which has hampered Braniff's ability to reorganize, is substantially greater than any harm to GPA Group, GPA Leasing, ATL, and GPA Corp. which would result if the court were to refuse to issue a permanent injunction to prevent these defendants from acting in derogation or contravention of Braniff's rights in and to the A320 aircraft.

88. Wilmington was an integral part of the transaction whereby Braniff was to have possession and use the 26 aircraft. Its representative were involved in the closings.

89. The Head Leases, to which Wilmington is a party, are interconnected with the Subleases.

(a) The term "Initial Sublessee" is defined to mean Braniff.

(b) In Section 10 of the Head Lease, Wilmington "acknowledges and consents to the Sublease ... under the Initial Sublease ... and ... agrees that performance ... by [Braniff] ... of the obligations of [GPA Leasing] under this Lease shall ... constitute performance and discharge by Lessee...." [DX-7].

(c) Section 6 and Section 8 permit Wilmington to interfere with Braniff's possession of the aircraft if Braniff defaults under the Sublease. [*Id.*].

## CONCLUSIONS OF LAW

### *Jurisdiction*

90. This court has jurisdiction over the parties and the subject matter of this adversary proceeding and these contested matters pursuant to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the standing order of reference entered by the district court. These are core proceedings within the meaning of 28 U.S.C. § 157(b). In addition,

(a) Jurisdiction exists as to the adversary proceeding filed by Braniff under 11 U.S.C. §§ 105, 362, and 365(e)(1).

(b) Jurisdiction exists as to the counterclaims filed by GPA Group, GPA Leasing, GPA Corp., and ATL under 11 U.S.C. §§ 105, 365, and 541.

(c) Jurisdiction exists as to GPA Leasing's Motion for Relief from Stay and for Adequate Protection under 11 U.S.C. § 362 and on Braniff's Motion for Order Authorizing Rejection of A320 Partial Assignment, Assumption, Release and Amendment Agreement under 11 U.S.C. § 365.

(d) Jurisdiction exists as to the Motion of GPA Group, GPA Leasing, GPA Corp., and ATL to Require Braniff to Assume or Reject Existing Contracts Within a Reasonable Time under 11 U.S.C. § 365.

### *Complaint and Counterclaim*

91. Wilmington and AVSA are proper parties defendant to this action in order that complete relief might be accorded among the other parties. F.R.Civ.P. 19(a); Bankruptcy Rule 7019; *Allright Missouri, Inc. v. Billeter,* 829 F.2d 631, 643 (8th Cir.1987) (to be a necessary party, it is not required that Braniff accuse Wilmington or AVSA of wrongdoing or seek specific relief against Wilmington and AVSA); *Naartex Consulting Corp. v. Watt,* 722

F.2d 779, 788 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984) (an entity with a clear and substantial interest in the subject of the contract is necessary and indispensable).

92. The owner participants, Chrysler Capital Corporation and Pitney Bowes, are not indispensable parties to this proceeding. F.R.Civ.P. 19.

93. The Lease Commitment, BAC 1–11 Leases, and Purchase Agreement are governed by New York law. The Subleases are governed by Connecticut law.

94. Under New York and Connecticut law, a notice that fails to specify the grounds for termination of an executory contract is invalid and does not act to terminate the contract. *In re Musikahn Corp.,* 57 B.R. 938 (Bankr.E.D.N.Y.1986); *Perrotta v. Western Regional Off–Track Betting Corp.,* 98 A.D.2d 1, 469 N.Y.S.2d 504 (N.Y.App.Div.1983); *Zullo v. Smith,* 179 Conn. 596, 427 A.2d 409 (1980). The September 27 termination notices from GPA Group, GPA Leasing, ATL, and their affiliates were insufficient, as a matter of law, in that they failed to provide any specificity regarding Braniff's purported defaults. *In re Musikahn Corp., supra; Zullo v. Smith, supra.*

95. A creditor may voluntarily waive a right that it has pursuant to a written agreement to declare an event of default and to terminate the contract as a result of the default. *Apex Pool Equipment Corp. v. Lee,* 419 F.2d 556 (2d. Cir. 1969) (New York law); *MacKay v. Aetna Life Insurance Co.,* 118 Conn. 538, 173 A. 783 (1934).

96. Waiver is a voluntary relinquishment of a known right, and acts and conducts inconsistent with an intention to terminate a contract are sufficient to evidence a waiver. *Id.*

97. GPA Group, GPA Leasing, and ATL waived any rights they may have had to terminate the Subleases, Lease Commitment, September Letter Agreement, and BAC 1–11 Leases by their conduct and acts which were inconsistent with an intention

to extinguish such agreements and leases. *Id.*

98. As courts of equity, bankruptcy courts must apply equitable principles and "direct to be done that which ought to be done." *In re Bronx–Westchester Mack Corp.,* 4 B.R. 730 (Bankr.S.D.N.Y.1980).

99. GPA Group, GPA Leasing, and ATL were not permitted to terminate the Subleases, Lease Commitment, BAC 1–11 Leases, and September Letter Agreement several hours before Braniff filed for relief under Chapter 11 of the Bankruptcy Code, where the possibility of Braniff filing for relief under Chapter 11 had been raised by Braniff early in discussions involving the global transaction, where GPA Group and its affiliates continued to work with Braniff toward the global transaction up through September 27, 1989 (the day the termination notices were sent), and when the purported terminations were provided immediately after GPA Group representatives heard that Braniff might be filing a Chapter 11 petition that day. *Id.* A creditor should not be permitted to terminate extremely valuable contract rights that belong to a financially distressed debtor "by jumping the gun on what is perceived to be a race to the courthouse." *Id.* at 734.

100. Where a few hours before the debtor files a bankruptcy petition, a lessor sends a termination notice after it heard rumors of the impending bankruptcy, without specifying the grounds for termination, the termination is improper. *See Bronx–Westchester,* 4 B.R. 730.

101. An immaterial deviation from a contract is insufficient to justify a termination of the contract. *Restatement (Second) of Contracts* § 237 and § 241 (1982); *Restoration Realty Corp. v. Robero,* 58 N.Y.2d 1089, 462 N.Y.S.2d 811, 449 N.E.2d 705 (1983).

102. A creditor is estopped from terminating valuable contract rights where the creditor's conduct led the debtor to believe the rights would not be terminated, where the debtor relied on the creditor's words or conduct, and where termination would result in injury to the debtor. *See*

*Aeromar v. Port Authority of New York and New Jersey,* 145 A.D.2d 584, 536 N.Y. S.2d 173 (N.Y.App.Div.1988); *American Bartenders School, Inc. v. 105 Madison Co.,* 59 N.Y.2d 716, 463 N.Y.S.2d 424, 450 N.E.2d 230 (1983); *Otis Elevator Co. v. Heggie Realty Co., Inc.,* 437 N.Y.S.2d 832, 107 Misc.2d 67 (1980).

 103. The parties to the September Letter Agreement, which deferred or extinguished certain of Braniff's obligations, intended the agreement to continue in effect until after September 28, 1989. The September Letter Agreement is ambiguous in regard to its expiration date; therefore, parol evidence can be admitted to explain what the parties intended. *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23 (2d Cir.1988).

104. Chodorow's testimony that the parties knew that the September 20 date was unrealistic but inserted the date to encourage an expeditious effort to close the global transaction and Barrington's testimony that the global transaction would not likely be completed by that date shows that the parties did not intend the September Letter Agreement to expire on September 20.

105. The subsequent conduct of the parties showing that, after September 20, GPA Group, GPA Leasing, ATL and Braniff continued to work toward the global transaction further evidences an intention that the agreement not expire on September 20. *Viacom International, Inc. v. Lorimar Productions, Inc.,* 486 F.Supp. 95, 98 n. 3 (S.D.N.Y.1980).

106. GPA Group, GPA Leasing, and ATL are deemed to have agreed to the Extension Letters by reason of their conduct. *In re Northeast Resources, Inc.,* 21 B.R. 109 (Bankr.D.Conn.1982); *Karel v. Clark,* 129 A.D.2d 773, 514 N.Y.S.2d 766 (N.Y.App.Div.1987).

 107. The failure of GPA Leasing, GPA Group, or ATL to object to nonpayment of the $30,000 maintenance accrual under the July 13, 1989, Sublease, the $860,000 BAC 1–11 rent, and the $1 million hushkit amount, coupled with these defendants' conduct and actions showing that

they considered the Subleases, BAC 1–11 Leases, Lease Commitment, and September Letter Agreement still in existence, evidence that GPA Leasing, GPA Group and ATL chose to continue the agreements, not to terminate them. *Restatement (Second) of Contracts* § 309 (1982); 5 *Williston on Contracts* § 683 (3d ed. 1961).

108. GPA Group, GPA Leasing, and ATL are estopped, by their conduct, from attempting to terminate the Subleases, Lease Commitment, September Letter Agreement, and BAC 1–11 Leases due to the nonpayment of the $860,000, BAC 1–11 rent, the $1 million hushkit amount, and the $30,000 maintenance accrual.

 109. Because Braniff kept GPA Group, GPA Leasing, and ATL well informed concerning Braniff's deteriorating financial condition through September 27, 1989, and because these defendants continued, through their conduct, to recognize the validity and existence of the Subleases, BAC 1–11 Leases, Lease Commitment, and September Letter Agreement, they are estopped from and have waived any right to raise, as an event of default, the deterioration of Braniff's financial condition and Braniff's net worth requirements.

 110. Hearsay reports that Braniff's suppliers were not being paid by Braniff and were refusing to deliver product to Braniff does not amount to grounds to claim Braniff's material breach of contract for failing to pay debts as they generally come due. Even though Braniff was delaying payment of some suppliers, the instances in which this occurred were not sufficient in number or amount so as to be material. Accordingly, GPA Leasing, GPA Group, and ATL had no right to declare an event of default on that basis.

111. There was no evidence that Braniff made representations and warranties with respect to its financial condition that were incorrect or misleading.

 112. Clauses that purport to terminate agreements when action is taken to further a reorganization are "ipso facto clauses" that are invalid under Section 365(e) of the Bankruptcy Code. Such

clauses hamper the reorganization process. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 591 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787.

▮ 113. Braniff made representatives of GPA Group and its affiliates aware, by early September, 1989, that filing for a reorganization was a possibility. Despite this knowledge, and in the face of Braniff's deteriorating financial condition, the parties continued to move forward with the global transaction and the aircraft closings. Under the doctrines of waiver and estoppel, GPA Group and its affiliates cannot declare a default for taking corporate action in furtherance of a reorganization.

▮ 114. Because Braniff was not in default of the September Letter Agreement, the Subleases, the Lease Commitment, and the BAC 1–11 Leases, GPA Leasing, GPA Group, and ATL violated the automatic stay under Section 362 of the Bankruptcy Code by closing on aircraft numbers 6, 7, 8, and 9 in derogation of Braniff's rights. *In re Varisco*, 16 B.R. 634 (Bankr.M.D.Fla.1981); *In re American Central Airlines, Inc.*, 52 B.R. 567 (Bankr. N.D.Iowa 1985).

115. Because Braniff was not in default of the September Letter Agreement, the Subleases, the Lease Commitment, and the BAC 1–11 Leases, AVSA violated the automatic stay under Section 362 of the Bankruptcy Code by delivering aircraft numbers 6, 7, 8, and 9 to GPA Group and/or GPA Leasing in a manner inconsistent with Section 13 of the Partial Assignment. *Id.*

▮ 116. The Subleases, the Lease Commitment, the BAC 1–11 Leases, and the aircraft subject thereto, as well as the rights of Braniff under the September Letter Agreement, were property of the estate at the time the Chapter 11 petition was filed. 11 U.S.C. § 541.

▮ 117. A party seeking a permanent injunction must establish an irreparable injury to itself and the lack of an adequate remedy at law. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *International Ass'n of Firefighters v. City of Sylacauga*, 436 F.Supp. 482 (N.D.Ala.1977).

▮ 118. Braniff has no adequate remedy at law and will suffer irreparable injury without the issuance of a permanent injunction in that the rights to and in the 26 A320 aircraft that are the subject of the Partial Assignment are necessary to an effective reorganization. Although the value of these rights to Braniff are substantial, the value cannot be specifically quantified. The inability to reorganize is irreparable. *Engine Specialties, Inc. v. Bombardier*, 454 F.2d 527 (1st Cir.1972); *In re Ike Kempner & Bros., Inc.*, 4 B.R. 31 (Bankr.E.D.Ark.1980).

119. The entry of an injunction will not cause substantial harm to GPA Group, GPA Leasing, GPA Corp., or ATL because the GPA Group companies received substantial profit and benefits at the closing of A320 aircraft. The rental payments to the Owner Trustee, which are substantially less than the rent due by Braniff, are not required to be made until at least August, 1990. Additionally, there is no conflicting public interest that is effected by the entry of such an injunction.

120. Pursuant to Section 105(a) of the Bankruptcy Code, the bankruptcy court is granted significant power to enter any order necessary or appropriate to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). Because of the wrongful conduct of GPA Group, GPA Leasing, ATL, and other GPA Group affiliates in attempting to terminate Braniff's rights in the 26 aircraft and AVSA's and the GPA Group companies' improper actions in closing on aircraft 6 through 9 in derogation of Braniff's rights, a permanent injunction is properly entered to provide Braniff a remedy for the cloud that existed on its title and rights to the aircraft for approximately 60 days. 11 U.S.C. § 105(a). *Hall v. Board of School Comm'rs of Conecuh County*, 656 F.2d 999 (5th Cir.1981); *In re Ike Kempner & Bros., Inc.*, 4 B.R. 31, 32–33 (Bankr.E.D.Ark.1980).

▮ 121. Even if a proper notice of termination is given before the filing of a

petition, where a cure period extends to the post-petition period, the debtor has rights in the contract. *In re ERA Central Regional Services, Inc.*, 39 B.R. 738 (Bankr.C. D.Ill.1984).

■ 122. Braniff has failed to establish its claims against any defendant for tortious interference and conversion.

*Motion of GPA Leasing to Lift the Automatic Stay (and GPA Group's Counterclaim)*

123. The automatic stay as to the Subleases cannot be lifted unless there is cause (for example, lack of adequate protection), or the debtor has no equity in the property and the property is unnecessary for an effective reorganization. 11 U.S.C. § 362(d).

■ 124. The creditor seeking relief has the burden of proving the issue of the debtor's equity in the property, and the debtor has the burden to prove the remaining issues. 11 U.S.C. § 362(g).

■ 125. The Subleases were not validly terminated before the petition was filed by Braniff in that there were no events of default by Braniff and the notices of termination were insufficient as a matter of law.

126. GPA Leasing and its affiliates are adequately protected with respect to the Subleases.

127. Braniff's rights in the 26 aircraft that are the subject of the Partial Assignment are valuable to the estate, and Braniff has equity in the Subleases.

128. The aircraft that are subject to the Subleases, together with the subsequent stream of 21 A320 aircraft subject to the Partial Assignment and Lease Commitment, are necessary for an effective reorganization.

129. The Lease Commitment is a valuable asset of the estate and is necessary for an effective reorganization. It was not terminated prior to the filing of the petition.

■ 130. The Lease Commitment is not a "true lease" for the purpose of Sec-

tion 1110 of the Bankruptcy Code. 11 U.S.C. § 1110; U.C.C. § 1-201(37).

131. GPA Group and Braniff never intended the Lease Commitment to serve as a lease: it is evident throughout the Lease Commitment ("Lease Commitment") and attached Summary of Principal Terms ("Lease Commitment Summary") that separate leases were to be entered into between the parties each time an aircraft was delivered. *See* B. Fritch, A. Reisman & I. Shrank, *Equipment Leasing—Leverage Leasing* at 51 (3d ed. 1988).

132. The Subleases, however, are subject to Section 1110 of the Bankruptcy Code.

■ 133. As to waiver or estoppel with respect to the 60-day period in which the debtor may cure under Section 1110 of the Bankruptcy Code, the actions of the GPA Group and its affiliates were not so egregious as to justify the court's entry of an order involuntarily and nonconsensually extending the 60-day cure period.

■ 134. Section 1110 does not, in and of itself, create a right to recover possession of aircraft. *See In re Airlift International, Inc.*, 70 B.R. 935 (Bankr.S.D.Fla. 1987).

*GPA Group's Motion Requesting Order Requiring Assumption or Rejection of Lease Commitment*

■ 135. The Lease Commitment is not a financial accommodation. Braniff is therefore free to assume or reject it pursuant to Section 365(a) of the Bankruptcy Code. 11 U.S.C. § 365(a).

■ 136. Multiple contract documents may form one unified agreement. *McKinney v. Gannett Co.*, 660 F.Supp. 984 (D.N. M.1981), *app. dismissed and remanded*, 694 F.2d 1240 (10th Cir.1982), *aff'd*, 817 F.2d 659 (10th Cir.1987); *In re Gardinier, Inc.*, 831 F.2d 974 (11th Cir.1987), *reh'g denied*, 849 F.2d 1480, *cert. denied*, 488 U.S. 853, 109 S.Ct. 140, 102 L.Ed.2d 112 (1988); 6 Williston, *Contracts* (3d ed. 1957) § 859 at 251.

137. With respect to the 26 aircraft that are the subject of this dispute, the Lease Commitment, Partial Assignment, and Purchase Agreement are part of one unified contract. *McKinney v. Gannett Co., Inc., supra.*

138. Under Section 365(c)(2) of the Bankruptcy Code, the characterization of a contract as a financial accommodation is intended only to apply to actual extensions of cash or extensions of a line of credit, and is not intended to embrace ordinary contracts to provide goods or services over time. *In re Charrington Worldwide Enterprises, Inc.*, 98 B.R. 65 (Bankr.M.D. Fla.1989), *aff'd*, 110 B.R. 973 (M.D.Fla. 1990); *In re Karsh Travel, Inc.*, 87 B.R. 110 (Bankr.N.D.Cal.1988), *aff'd*, 102 B.R. 778 (Bankr.N.D.Cal.1989).

139. The financing aspects under the Lease Commitment, Partial Assignment, and Purchase Agreement are incidental to the purpose of the unified agreement. They are, therefore, not a "financial accommodation" within the meaning of Section 365(c)(2) of the Bankruptcy Code. 11 U.S.C. § 365(c)(2); *In re Wegner Farms Co.* 49 B.R. 440 (Bankr.N.D.Iowa 1985); *In re Farrell*, 79 B.R. 300 (Bankr.S.D.Ohio 1987); *Harper v. Victor Motors and Western Surety (In re Victor Motors)*, No. 82M–00233, slip op. (Lexis, Bankruptcy Library) (Bankr.D.Utah, May 27, 1983).

140. The combination of the Lease Commitment, Partial Assignment, and Purchase Agreement relating to the 26 aircraft, as one unified contract, is an executory contract, assumable in the future under Section 365(a) of the Bankruptcy Code. 11 U.S.C. § 365(a). The debtor has until the confirmation of its plan of reorganization to determine whether to assume or reject executory contracts, although this period may be shortened by order of the court upon the request of a party in interest. 11 U.S.C. § 365(d)(3).

141. The debtor must be given a reasonable time in which to make the decision to assume or reject an executory contract. *See, e.g., Theatre Holding Corp. v. Mauro*, 681 F.2d 102 (2d Cir.1982); *In re Dunes Casino Hotel*, 63 B.R. 939 (D.N.J. 1986). What is a reasonable time is left to the sound discretion of the bankruptcy court in light of the circumstances of the case. *Dunes, supra* at 949.

142. During the approximately 60 days between the filing of the petition and this court's decision, there has been a cloud on Braniff's title and right to the 26 aircraft, which made it difficult for Braniff to begin formulating a plan of reorganization including the aircraft. As a result, Braniff needs a reasonable period of time in the future to determine whether to assume or reject the agreements so as to maximize the creditors' recovery in this proceeding. *Theatre Holding Corp. v. Mauro*, 681 F.2d 102 (2d Cir.1982). Accordingly, it would be inappropriate to require Braniff to assume or reject the agreements at this time. *Id.*

### *Braniff's Motion to Reject Partial Assignment*

143. Since the Lease Commitment, Purchase Agreement and Partial Assignment are part of one unified contract, they cannot be rejected or assumed "in pieces." Accordingly, Braniff cannot reject only the Partial Assignment.

### *Cross Default Provisions*

144. Under Section 365 of the Bankruptcy Code, a debtor has an absolute right to assume an unexpired lease and to cure defaults subject to court approval. 11 U.S.C. § 365; *In re Westview 74th Street Drug Corp.*, 59 B.R. 747 (Bankr.S.D.N.Y. 1986).

145. Cross default provisions are unenforceable in bankruptcy where the provisions restrict the debtor's ability to assume an executory contract. *In re Sambo's Restaurants, Inc.*, 24 B.R. 755 (Bankr. C.D.Cal.1982). Accordingly, cross default provisions in the agreements that are the subject of this case are unenforceable.

### CONCLUSION

Based upon these findings and conclusions (which replace the oral, preliminary findings and conclusions dictated into the

record on November 25, 1989), the court has entered its judgment and final decree.

DONE and ORDERED.