**In re BRONX–WESTCHESTER MACK CORPORATION, Debtor.**

**Bankruptcy No. 80–B–20220.**

United States Bankruptcy Court, S. D. New York.

June 27, 1980.

Russo, Lombardi & Frucco, White Plains, N. Y., for debtor; Charles Weintraub, of counsel.

Frank, Frank, Berger & Goldstein, New York City, for Mack Trucks, Inc.

DECISION ON ORDER TO SHOW CAUSE SEEKING DECLARATION THAT DISTRIBUTOR AGREEMENT BETWEEN DEBTOR AND MACK TRUCKS, INC. REMAINS IN FULL FORCE AND EFFECT

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor in this Chapter 11 case seeks, among other things, an order declaring that its distributorship agreement with Mack Trucks, Inc. remains in full force and effect. A written notice of termination, dated May 15, 1980, was received by the debtor just before it filed its petition for an arrangement under Chapter 11 of the Bank-

ruptcy Reform Act of 1978, 11 U.S.C. § 1101 et seq., on May 27, 1980. Alternatively, the debtor seeks to obtain judicial authorization to cure the pre-Chapter 11 contract termination.

■ The debtor's alternative argument may be disposed of summarily. If it is determined that the distributorship agreement in question was effectively terminated prior to the filing of the Chapter 11 petition, this court would then have no power to permit the curing of such termination, as distinguished from the curing of defaults under *existing* contracts, which is expressly authorized under Code § 365(b). This point was previously stated in *GSVC Restaurant Corp.*, 6 Bankr.Ct.Dec. 134 (S.D.N.Y.1980), aff'd 6 Bankr.Ct.Dec. 295 (S.D.N.Y.1980), and in *In re Butchman*, CCH ¶¶ 67, 454 (S.D.N.Y.1980) at page 77,777, as follows:

"When a debtor's legal and equitable interests in property are terminated prior to the filing of the petition with the Bankruptcy Court that was intended to preserve the debtor's interest in such property, the Bankruptcy Court cannot then cultivate rights where none can grow."

The cases cited by the debtor with respect to the curing of defaults under existing contracts do not support the resurrection of a contract effectively terminated before the filing of a petition for relief with the Bankruptcy Court. Hence, consideration must be given to the vitality of the contract in question.

### FINDINGS OF FACT

1. The debtor, Bronx-Westchester Mack Corporation, is a corporation engaged in the business of selling and servicing Mack Trucks and the sale of truck parts, including the repairing of all types of trucks.

2. Mack Trucks, Inc. manufactures and sells trucks and parts under the trademark "Mack".

3. Mack Financial Corporation is a subsidiary of Mack Trucks, Inc. and is engaged in the financing of sales for its corporate parent.

4. On December 20, 1965, the debtor entered into a written distributorship agreement with Mack Trucks, Inc. whereby the debtor was authorized to sell and service Mack Products. Section 25 of the distributorship agreement permits termination by mutual consent of the parties, or by Mack Trucks, Inc., upon not less than sixty days' prior written notice. Additionally, Mack Trucks, Inc. may terminate the agreement effective immediately by written notice to the debtor upon the happening of certain events including: "Default by the Distributor in the payment of any obligation owing to the Company or to Mack Financial Corporation."

5. In October 1979, the debtor underwent a change in management. The amount owed by the debtor to Mack Trucks, Inc. and Mack Financial Corporation as of October 29, 1979 for Mack parts was $368,-782.85.

6. The debtor's new management reduced the outstanding indebtedness to the Mack corporations so that as of May 1, 1980, the balance owed was $211,297.31.

7. On April 29, 1980, the debtor's accountant, attorney and president met with representatives of both Mack corporations with a view towards submitting financial information concerning the debtor's status. In an inter-office memorandum dated April 29, 1980 summarizing the meeting, Mr. Roger Blanchard, the regional manager of Mack Financial Corporation, noted in part as follows: [Exhibit B]

"There were no additional monies presented or available to Mack to reduce the parts receivable; they did not have available current or projected cash flow nor could they anticipate what their profit picture would be in the future.

No additional free and clear assets or collateral were available to secure our debt at this time. They still have not prepared an ageing of receivables which was accepted by the accountant; however, the pencilled figures indicated a 30% current and 1–30 day position on in-house figures. The in-house figures also indicated approximately $92,000 on a total receivable of $260,000 over 120 days.

Mr. Micheli has requested an additional seven days in order that his counsel and his accountants can submit to Mack a chronology of all events and discoveries made after his taking over BWM.

His counsel and his accountants will offer an arrangement of payment for Mack to consider in order for BWM to continue operation.

As of this date, they were unable to pay accumulated interest and service charge of approximately $11,000 which was requested, due as of March 31, 1980.

It is recommended we wait until Tuesday, May 6, at which time they will have available their proposal of arrangement of payment before we seek our legal remedies."

8. A second meeting between representatives of the debtor and the Mack corporations was held at the debtor's premises on May 13, 1980. The debtor's attorney also attended this meeting. He advised the Mack representatives that he was preparing to file a petition for relief under Chapter 11 of the Bankruptcy Code and that the financial information needed for the schedules was not yet available but could be presented to the Mack representatives the next week. The debtor's counsel therefore requested another meeting on May 19, 1980 to discuss the debtor's financial predicament.

9. Mr. Earl Kline, a vice president of Mack Trucks, Inc., advised the debtor's counsel not to be surprised if the debtor received in the mail a notice of termination of the distribution agreement. The debtor's counsel responded that this situation would result in a race to the courthouse and that he hoped that Mack Trucks, Inc. would not terminate the agreement before the meeting agreed to for the next week when the debtor would have available more complete financial information. Mr. Blanchard, the regional manager of Mack Financial Corporation and Mr. John Brown, a district manager of Mack Financial Corporation, both of whom were also at the meeting, admitted that Mr. Kline then informed the debtor's counsel that he [Kline] would not take any action until the financial information was received on May 19, 1980.

10. Mr. Blanchard summarized this meeting in an inter-office memorandum dated May 14, 1980, which states in part as follows: [Exhibit 1]

"We were informed that it was the intent of BWM to file a Petition in Bankruptcy, Chapter XI on May 20, 1980. They requested a meeting, through Mr. Kline, with Home Office personnel and counsel to discuss the matter on May 19 at 11:00 AM. Initially, this meeting was scheduled to be held at BWM but the attorney before leaving their premises advised he would prefer a meeting with Mack counsel at World Headquarters and would be sending a letter of request today.

In capsule form, they owe outside unsecured vendors approximately $444,000 as of March 31, 1980 and the reorganization is being used to have these unsecured creditors take a settlement on debts incurred prior to the obtaining of all stock by the new owners.

The Petition in Bankruptcy will be presented to Mack during the scheduled meeting and will reflect the financial condition of this corporation and will also have an anticipated cash flow which will be understated to obtain a better settlement with the unsecured creditors.

Though no financial statements or other reconciliation of receivables were supplied, even though requested, they verbally advised they did have presently approximately $185,000 parts inventory at both locations. Their parts account with Mack Company at the end of April totaled $231,000 and with credits it can be construed that we are at a break-even or a deficit position.

.     .     .     .     .

Mr. Kline has alerted Mr. Rossetti of all the information developed during this meeting. He states he prefers to have this meeting still held at the premises of BWM. Mr. Rossetti is to advise whether in-house counsel will be present. We have supplied the Security Agreement, filings, Guarantees and financial informa-

tion to our outside counsel who specializes in bankruptcies, Arnold Goldstein of the firm Frank, Frank, Berger & Goldstein, 424 Madison Ave., New York, N.Y. Mr. Goldstein stated today he recommends immediate litigation against the Guarantors, A. Micheli, individually, and Ram Equipment and Bronx-Westchester for the balance owing the Mack Company and should BMW file a petition in Bankruptcy next week, he will immediately issue a show cause application to the Federal Court requesting return of parts and security of same until the return thereof.

Mr. Kline further advised today that Mr. Rossetti, through in-house counsel, will research the question whether Mack can terminate the franchise of a dealer who is in bankruptcy."

11. Mack Trucks, Inc. argues that prior to the change in management in October, 1979, the debtor was never more than sixty days past due, whereas now $153,930.03 of the outstanding balance of $211,297.31 owed to it by the debtor is past due over sixty days. The debtor's secretary-treasurer confirmed that approximately $150,000 was past due.

12. On May 16, 1980, the debtor received a letter from Mack Trucks, Inc., dated May 15, 1980, advising that the distributorship agreement was terminated for specified reasons including "your insolvency and default in payment of obligations owing to Mack Trucks, Inc. and Mack Financial Corporation."

13. On May 27, 1980, the debtor then filed its petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978.

## DISCUSSION

■ Mack Trucks, Inc. (hereinafter called "Mack") urges that it had valid grounds for terminating the debtor's distributorship agreement effective immediately upon the giving of written notice of such termination. The debtor counters with the argument that the termination was improper as a matter of bankruptcy law and also without sufficient cause, notwithstanding the Bankruptcy Code. Since this court holds that it does not have the power to permit a pre-petition contract termination to be cured in the same fashion as a pre-petition default under an existing contract, it necessarily follows that Bankruptcy Code § 365(b), which deals with the curing of defaults under existing contracts, is of little comfort to the debtor. The efficacy of the termination of the debtor's distributorship agreement must then hinge upon nonbankruptcy principles.

Section 197 of the General Business Law of the State of New York, McKinney's Consolidated Laws, c.20, provides that no manufacturer or distributor shall terminate any contract for the sale of new motor vehicles to a distributor "except for cause." The debtor contends that financial defaults do not constitute cause and that only the dealer's bad faith or fraud would be sufficient cause for termination of the distributorship agreement. This position ignores the fact that the parties provided for a termination clause in their contract. Pursuant to Section 25 of the contract, Mack could terminate the contract, effective immediately upon written notice to the debtor, in the event of: "Default by the Distributor in the payment of any obligation owing to the Company or to Mack Financial Corporation." Having agreed that a financial default was sufficient cause to terminate the contract, it now ill behooves the debtor to argue otherwise. See *Cycleway Inc. v. Kawasaki Motors Corp.*, 77 Misc.2d 829, 354 N.Y.S.2d 812, 816 (Sup.Ct. Oneida County, 1974).

Although Mack had sufficient cause to terminate the contract, it must next be considered whether or not the letter of May 15, 1980 constituted effective notice of termination, as required under Section 25 of the distributorship agreement.

The debtor's counsel informed Mack's representatives at their meeting on May 13, 1980, that he was preparing a petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978. Had he then filed the petition before the debtor received notice of termination of the distributorship agreement, the debtor would have had the bene-

fit of the automatic stay under Code § 362 and would have had the right to comply with the conditions expressed in Code § 365 for the assumption of the executory distributorship contract. Moreover, the distributorship right under the contract would constitute a valuable asset of the estate within the meaning of Code § 541. The debtor's counsel recognized the significance of these rehabilitative measures when he requested Mack's representative not to terminate the contract before the scheduled meeting the following week when more complete financial information was to be presented to Mack in an effort to work out a financial arrangement. Mack's vice president expressly agreed not to cause a notice of termination to be issued before the meeting the following week. Believing that he had a respite for an additional week, the debtor's counsel did not file the Chapter 11 petition in reliance upon Mack's promise that no notice of termination would be issued. This aspect dispensed with the so-called race to the courthouse that was referred to at the meeting. Despite such assurance, Mack attempted to better its position by terminating the distributorship agreement before it came under the aegis of this court.

The issue is not whether the debtor may assert its right to life with respect to activities on the eve of bankruptcy, nor whether this court will sanction the resurrection of a terminated contract, but rather whether Mack should be permitted to pull the plug on this financially distressed debtor by jumping the gun on what it perceived to be as a race to the courthouse.

In viewing the actions of the parties to this litigation, the court is mindful of the fact that it exercises "the powers of a court of equity, law and admiralty . . .". 28 U.S.C. § 1481. As a court of equity, this court must apply equitable principles and direct to be done that which ought to be done. Manifestly, the debtor's attorney would not have hesitated in filing the Chapter 11 petition had he not relied upon Mack's assurance that no termination notice would be issued prior to their next scheduled meeting. In the circumstances, Mack

should be estopped from asserting the effectiveness of the pre-petition termination notice. This principle was articulated by the United States Supreme Court in *Dickerson v. Colgrove*, 100 U.S. 578, 580, 25 L.Ed. 618 (1880) as follows:

"The estoppel here relied upon is known as an equitable or estoppel in pais. The law upon the subject is well settled. The vital principle is, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice. It is available only for protection, and cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond this limit. It is akin to the principle involved in the limitation of actions, and does its work of justice and repose where the statute cannot be invoked."

It does not follow, however, that the debtor's right to continue under the distributorship agreement is absolute and that the debtor may disregard the financial default which gave rise to Mack's right to terminate the contract for cause. In order to accept the salutory benefits afforded under the Bankruptcy Code, the debtor must assume the correlative responsibilities including the obligation to cure, or provide adequate assurance that it will cure the default and assurance of performance under the contract, as mandated under Code § 365(b).

## CONCLUSIONS OF LAW

1. The default under the contract currently amounts to approximately $150,000. Before the debtor may expect performance by Mack it must cure this default by payment or *adequate* assurance that this sum will be paid. Such assurance must be in the form of cash or collateral that is nonspecu-

lative, positive and sufficiently substantial so as to assure Mack that it will realize the amount of the default.

2. In addition, the debtor must provide adequate assurance that it will perform under the contract in question, including payment of the remaining balance of the total obligation of $211,297.31.

3. Notwithstanding Code § 108(b), the debtor shall comply with the requirements of Code § 365(b), as directed herein, within fourteen days from the date of the order to be entered in accordance with this decision.

SETTLE ORDER ON NOTICE.