**In re F.B.F. INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 91–24613 DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 8, 1994.

Jeffrey D. Cooper, Rawle & Henderson, Philadelphia, PA.

Gretchen Santamour, Lesser & Kaplin, P.C., Blue Bell, PA.

Joseph Minni, Office of the U.S. Trustee, Philadelphia, PA.

Jon M. Adelstein, Bensalem, PA.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Motion of S & S Tool & Instrument Company ("S & S") to Determine Value of Meridian Bank's Secured Claim Pursuant to Bankruptcy Rule 3012 (the "Motion") and S & S's Objection to Proof of Claim No. 110 filed by Meridian Bank (the "Objection"). A consolidated hearing on the Motion and the Objection was held on January 25, 1994 and each party submitted a letter brief on February 1, 1994.

### BACKGROUND

F.B.F. Industries, Inc. ("Debtor") filed a Chapter 11 case on December 17, 1991 and continues to operate its business under cash collateral agreements with Meridian Bank (the "Bank"). S & S is a Pennsylvania corporation formed for the purpose of acquiring the Debtor's assets through a plan of reorganization (the "Plan") which it filed on April 28, 1993.[1]

The Bank has filed a proof of secured claim in the amount of $1,247,852.02. The filed claim is based on obligations arising under certain promissory notes ("Debtor Notes") executed by the Debtor (Exhibits B–2, B–3, B–4 and B–5) and a Suretyship Agreement (Exhibit S–1). Neither the Debtor nor S & S objects to the Bank's secured status or contests the validity or priority of the Bank's liens on the Debtor's assets, nor is there an objection to the outstanding principal or interest claimed due under the Debtor Notes. Rather, the dispute revolves around the amount of the claim insofar as it includes the obligation arising under the Surety Agreement and fails to reflect a reduction for proceeds of collateral the Bank

allowed to be released to equityholders and were not applied to the loan described below.

On December 5, 1989, the Bank extended a loan to 1365 Industrial Boulevard Associates ("1365 Associates"), a general partnership whose partners are also directors of Debtor, in the original principal amount of $1,325,000 (the "1365 Loan"). The 1365 Loan was secured by a mortgage on two parcels of real property, one parcel located at 1365 Industrial Boulevard, Southampton, PA ("1365 Property")[2] and the other located at 1330 Industrial Boulevard, Southampton, PA ("1330 Property"). The Debtor executed a Surety Agreement pursuant to which it unconditionally agreed to become surety to the Bank for the full and prompt payment when due of the 1365 Loan. Upon the occurrence of any Default (as defined under the Surety Agreement), the Debtor agreed to pay the full amount of the 1365 Loan. Exhibit S–1.

The 1330 Property was sold on April 22, 1992 and the net proceeds, less $40,000 distributed to the 1365 Associates partners, were paid to the Bank to reduce the balance on the 1365 Loan which according to the testimony of Ellen Dodel, Assistant Vice President of the Bank, is $328,971.00 as of January 13, 1994.

The President and Chief Operating Officer of the Debtor is Keith Sanford. At the time of the commencement of the Debtor's bankruptcy case and at the time that the 1330 Property was sold, the directors of the Debtor were Keith Sanford, Ken Sanford, William and Casiana Ryan, and Norman and Bruce Cahan. During the same time periods, all of the directors of the Debtor, except for Ms. Ryan, were general partners of 1365 Associates.

In the Motion, S & S seeks a determination as to whether the Debtor's obligations to the Bank under the Surety Agreement are to be included in the Bank's claim.[3] The Mo-

---

1. Confirmation of the Plan, subsequently amended on October 7, 1993, was adjourned until March 28, 1994 pending a determination by S & S as to whether further amendment would be required. A plan of reorganization previously filed by the Debtor on March 1, 1993 was withdrawn and the S & S Plan is the sole plan being proposed.

2. 1365 Associates owns the 1365 Property and rents it to the Debtor.

3. The Motion also questioned whether the Debtor should have paid the Bank's legal fees because the fees were not approved by the Court. The parties have agreed that the disputed attorneys' fees will be resolved in the context of a separate motion by the Bank pursuant to § 506(b). Ac-

tion requests that this Court determine the amount of the Bank's secured claim for purposes of plan voting, confirmation and consummation. At the hearing on this matter, S & S contended that the portion of the Bank's claim arising under the Surety Agreement was contingent and for the first time expressly framed its requested relief as a request for claim estimation under § 502(c).

In the Objection, S & S alternatively argues that the Bank's claim should be reduced by $40,000 because the Bank impaired the value of the collateral for the 1365 Loan when it allowed $40,000 of the proceeds from the sale of the 1330 Property to be distributed to the partners of 1365 Associates to pay the capital gains tax relating to the sale without the consent or acknowledgement of the Debtor.[4] Exhibit S–2. If the $40,000 had been applied to reduce the balance due under the 1365 Loan instead of distributed to the partners, S & S argues, the Debtor's liability under the Surety Agreement would have been reduced by $40,000.

The Bank's Response to the Motion raised as new matter that the Bank's claim cannot be fully determined until the confirmation date of a plan of reorganization because interest continues to accrue and the Bank continues to incur attorneys' fees and expenses, both of which increase the Bank's claim. Furthermore, the Bank is receiving payments under a cash collateral stipulation which is reducing the claim. The Bank requests this Court to deny the Motion to the extent that a determination of the value of the Bank's secured claim limits the value of the Bank's secured claim for the purposes of Code § 506(b) and to determine the value of the Bank's secured claim for the purposes of plan voting only.

Since the parties agree that the Bank's claim will change by reason of the aforementioned accruals and payments noted by the Bank in its Response, the Court need only now determine (1) whether the Debtor's liability under the Surety Agreement should be included in the Bank's claim; and possibly (2) whether the Bank's claim should be reduced by the $40,000 distributed to 1365 Associates' partners from the sale of the 1330 Property. Aside from the consensually deferred issue of the Bank's legal fees, the parties are in agreement as to the other components of the Bank's claim and should be able to calculate the actual claim apart from legal fees as of the date of plan voting and recalculate it as of the date of confirmation on the basis of this decision.

## DISCUSSION

### I.

*The Debtor's Liability Under The Surety Agreement.* S & S argues that the Bank's claim under the Surety Agreement is contingent and subject to estimation under Code § 502(c)[5] because the Debtor is not in default of the Surety Agreement. Further, because the Bank is oversecured,[6] it is unlikely that the Debtor will ever have to pay under the Surety Agreement and, therefore, the Debtor's liability under the Surety Agreement should be estimated at zero.[7]

cordingly, no testimony or evidence was offered on this issue and we need not decide it at this time.

4. Obviously, if we found that the obligation under the Surety Agreement was contingent and estimated the contingent claim at zero, as S & S urges, we need not reach this issue.

5. Section 502(c) provides, in pertinent part:
(c) There shall be estimated for purpose of allowance under this section—
(1) any contingent or unliquidated claim, the fixing or the liquidation for which, as the case may be, would unduly delay the administration of the case;

6. The parties have stipulated that the Bank is oversecured.

7. The Bank noted at the hearing that S & S raised for the first time at the hearing the issue that the Bank's claim against the Debtor under the Surety Agreement was contingent and must be estimated. The Bank, however, is not prejudiced by the deficiencies in S & S's pleadings. Paragraph 5 of the Motion requests this Court to determine whether the Debtor's obligations to the Bank as a "guarantor and/or surety" are to be included in the Bank's secured claim. The Bank therefore had notice that the Bank's claim against the Debtor under the Surety Agreement was in issue and each party was afforded and took the opportunity to make a full record as to this claim. To the extent the question of whether the claim is contingent is a legal issue, the Court requested briefs to allow the parties to substantiate their positions on this point.

**548**

The Bank, however, argues that the Debtor's liability under the Surety Agreement is not contingent and therefore subject to estimation because the only event necessary to trigger liability, a default, has occurred.

The Code defines a "claim" to include any "right to payment ... whether or not such right is ... contingent ...". 11 U.S.C. § 101(5)(A). The Code does not define "contingent". Courts in this jurisdiction, *see In re Gordon,* 127 B.R. 574, 578 (Bankr.E.D.Pa. 1991) (Scholl, J.) and *In re Pennypacker,* 115 B.R. 504, 507 (Bankr.E.D.Pa.1990) (Twardowski, Ch. J.), have applied the definition of "contingent claim" originally set forth in *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981), as a

> debt ... which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger liability of the debtor to the alleged creditor and ... such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.

*See also Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.),* 744 F.2d 332, 336 n. 7 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985) ("bankruptcy judges have defined a contingent claim as a claim which becomes due only on the occurrence of a future event").

■ In order to determine whether the Bank's claim under the Surety Agreement is contingent, we must look to state law to determine the nature and extent of the Debtor's liability to the Bank under the Surety Agreement. *In re Altair Airlines, Inc.,* 727 F.2d 88 (3d Cir.1984). Both parties agree

that the applicable state law is the law of Pennsylvania. Both parties also appear to agree and we do find that the Debtor's liability under the Surety Agreement is as a surety, not as a guarantor.[8]

■ A surety, as contrasted to a guarantor, and the principal for a debt are both primarily liable for the obligation upon a default. *Plummer v. Wilson,* 322 Pa. 118, 121, 185 A. 311, 313 (1936); *McCrossan,* 336 Pa.Super. at 547 n. 2, 486 A.2d at 399 n. 2. A surety's liability is "direct and immediate"; his liability to the obligee is coextensive with the primary liability of the principal. 35 P.L.E. Suretyship § 51 (1993). The distinction between a surety and a guarantor has been stated as follows:

> A guarantor undertakes that another person will pay a debt or perform a duty and such other person remains primarily liable. On the other hand, a surety undertakes to pay the debt or perform the obligation if the debtor fails to do so. In case of default the guarantor is secondarily liable while the surety is equally liable with the principal.

*Homewood People's Bank,* 263 Pa. at 263–64, 106 A. at 309.

S & S argues that the Debtor's liability under the Surety Agreement is contingent because the Debtor's liability does not arise until the occurrence of a default and there has been no such default. The Bank acknowledges that the direct and immediate liability of the surety is limited by the requirement that a default must have occurred but asserts that defaults have occurred.

■ The law is clear that a guaranty or surety claim is not contingent after a default

---

8. Courts in Pennsylvania, distinguishing between a guaranty and a surety agreement, have stated as a general principle that

> where the contract defines the time when the promisor is to assume liability for the debt, his obligation is that of suretyship; but where there is no time fixed the obligation is general and merely that of guaranty.

*Homewood People's Bank v. Hastings,* 263 Pa. 260, 264, 106 A. 308, 309 (1919).

Under Pennsylvania law every written agreement made by one person to answer for the default of another subjects such person to the "liabilities of suretyship" unless the agreement

specifically provides that it is not intended to be a suretyship agreement. 8 P.S. § 1. In determining whether a contract is one for surety or guaranty, the use of the words "guaranty" and "surety" are not dispositive. *First National Consumer Discount Company v. McCrossan,* 336 Pa.Super. 541, 547 n. 2, 486 A.2d 396, 399 n. 2 (1984) (quoting 38 C.J.S. Guaranty, § 6c). Rather, "the intent of the parties as gathered from the language of the instrument in the light of surrounding facts and circumstances [is] controlling". *Brock's Assigned Estate (No. 1),* 312 Pa. 7, 15, 166 A. 778, 781 (1933).

by the primary obligor has occurred. This is so because default is the sole extrinsic event which triggers liability of the debtor to the creditor. *In re Robertson*, 105 B.R. 504, 508 (Bankr.D.Minn.1989) ("debtor's obligation became non-contingent at the moment of default;" fact that debt was unliquidated because creditor had not foreclosed on primary obligors property not dispositive); *In re Pulliam*, 90 B.R. 241, 243 (Bankr.N.D.Tex.1988) (an absolute guaranty (i.e., guaranty of payment not collection) ceases to be contingent upon the principal obligor's default); *In re Williams*, 51 B.R. 249, 251 (Bankr.S.D.Ind. 1984) (same); *In re Flaherty*, 10 B.R. 118, 119 (Bankr.N.D.Ill.1981) (same); *In re Wilson*, 9 B.R. 723, 725 (Bankr.E.D.N.Y.1981) (same).

Thus, our first inquiry is whether there has been a default under the promissory note (Exhibit "B–6") ("1365 Note") for the 1365 Loan. The Bank looks to the definition of "Default" contained in the Surety Agreement and points to three possibilities: (1) the Debtor's chapter 11 bankruptcy filing, Exhibit S–1, Defaults ¶ (f); (2) a default under the promissory note evidencing the 1365 Loan arising from the Debtor's bankruptcy filing (Exhibit B–6), which default is a default under the Surety Agreement, Exhibit S–1, Defaults ¶ (h); and (3) 1365 Associates' failure to adhere to the payment terms set forth in the 1365 Note, Exhibit S–1, Defaults ¶ (a). We believe the "default" must be found in the 1365 Note and not in the Surety Agreement, and we will consider the proffered defaults in that context.

■■■ 1. The Debtor's filing of bankruptcy is the first default alleged. The bankruptcy of a co-obligor is clearly a default under the 1365 Note. Exhibit B–6, Defaults ¶ (g). S & S dismisses this event as legally insufficient. Citing § 365, it argues that commencing a bankruptcy case cannot be the basis for default since "*ipso facto* clauses are unenforceable in bankruptcy cases." S & S Brief at 6. S & S's argument may be correct, albeit for reasons other than it advanced. The 1365 Note is *not* an executory contract. An executory contract is most popularly defined as one "under which the obligation of both the bankrupt and the other party to the

contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Countryman, Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973). This definition has been adopted by the Third Circuit Court of Appeals and, therefore, is the definition we will use as well. *See Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir.1989).

Courts have generally held that a promissory "note is not ... an executory contract because the only performance that remains is repayment." *Watts v. Pennsylvania Housing Finance Co.*, 876 F.2d 1090, 1096 n. 9 (3d Cir.1989) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6303–04). *See also, In re Leibinger–Roberts, Inc.*, 105 B.R. 208, 212 (Bankr.E.D.N.Y. 1989); *In re EES Lambert Associates*, 62 B.R. 328, 336 (Bankr.N.D.Ill.1986); *Horton v. Rehbein (In re Rehbein)*, 60 B.R. 436, 440 (9th Cir. BAP.1986); and *In re Texstone Venture, Ltd.*, 54 B.R. 54 (Bankr.S.D.Tex. 1985). *Compare Huntington National Bank Company v. Alix (In re Cardinal Industries, Inc.)*, 146 B.R. 720, 729–30 (Bankr.S.D.Ohio 1992) (obligation on part of lender to complete funding renders credit agreement executory). Accordingly, § 365(e)(1) which nullifies the effect of *ipso facto* clauses is simply not applicable here because the 1365 Note is not an executory contract.

We recognize that there is authority for this Court to refuse to recognize the operation of a bankruptcy default provision as intruding upon Congressional purpose to provide debtors a fresh start toward reorganizing their financial affairs. *See Taylor v. Albany Government Employees Federal Credit Union (In re Taylor)*, 146 B.R. 41, 45–47 (M.D.Ga.1992), *rev'd and rem'd on other grounds*, 3 F.3d 1512, *reh'g denied*, 11 F.3d 169 (11th Cir.1993) and cases cited thereat. However, we note again that we are construing the 1365 Note and not the Surety Agreement. If indeed public policy precludes enforcement of an "ipso facto" clause contained in a non-executory contract of a debtor, a different result may obtain

with respect to the bankruptcy default under the 1365 Note, a non-debtor contract. Under that instrument delivered to the Bank by a party not in bankruptcy, the bankruptcy filing of the Debtor would be a default entitling the Bank to its remedies against 1365 Associates. Since the Debtor by reason of its suretyship is equally liable with 1365 Associates, it would seem to follow that the bankruptcy default could have the result urged by the Bank. Given our conclusions set forth below, we need not reach and resolve these thorny questions.

2. Non-payment of any of the liabilities under the 1365 Note is the other alleged default. The testimony established that subsequent to the sale of 1330 Property and concomitant reduction of the 1365 Loan, the Debtor decreased its monthly payments from $14,000.00 as provided in the 1365 Note to $8,500.00. The testimony further established that this reduction, while not the result of a formal restructure of the 1365 Loan, was with the express consent of the Bank. To memorialize its position, the Bank sent a letter on October 20, 1992 to 1365 Associates, with a copy to Debtor and its counsel, declaring a default by reason of Borrower's failure to tender the full amount due under the 1365 Note since August, 1992. Exhibit B–1.[9] In that letter, Bank expressly accepts the reduced payment without prejudice and declares that such acceptance "should not be construed as a waiver of any of its rights or as Bank's agreement to reduce the amount of the monthly payments."

■ To the extent the non-payment of the full amount of the 1365 Note was a default, we must consider whether the Bank waived such default. *See Samuel J. Marranca General Contracting Co., Inc. v. Amerimar Cherry Hill Associates Limited Partnership,* 416 Pa.Super. 45, 49, 610 A.2d 499, 501 (1992) ("Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a

purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary.").

The Third Circuit Court of Appeals applied the theories of waiver and implied waiver in *Philip Schifalacqua v. CNA Insurance,* 567 F.2d 1255 (3d Cir.1977) where the defendant insurance company denied coverage to the plaintiff insured after the policy had lapsed due to the non-payment of premiums. Several months after the policy lapsed, plaintiff's sister made and the insurance company accepted payment of the premiums. Relying on its notice of termination and the subsequent policy lapse, the defendant thereafter refused coverage for an intervening injury. The Court of Appeals concluded that, notwithstanding the defendant's letter to the plaintiff notifying him of the termination of coverage, the insurance company waived its right to declare a forfeiture of the policy due to the non-payment of the premium by accepting the late premium.

■ The Court of Appeals noted, however, that in Pennsylvania the doctrine of implied waiver applies only in situations equivalent to equitable estoppel. To prevail the person claiming the occurrence of the waiver must show that he was *misled or prejudiced* by the other party's actions. *Id.* at 1258. In that case, the plaintiff relied upon the defendant's acceptance of the premium payment and was prejudiced in that he failed to obtain other insurance coverage.

In *Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 199 A. 139, 142 (1938), a case factually similar to the one before this Court, the court stated that a court administering equitable principles will not permit a creditor to enforce forfeiture provisions according to the terms of a contract if by lulling "the debtor into a false sense of security he has led the debtor into a default which otherwise the debtor might have avoided." *Id.* The court further stated that a creditor by a "course of

---

**9.** S & S challenges the admissibility of Exhibit B–1 on the grounds that a copy was not provided to it in "informal discovery." The Court will overrule S & S's objection and will admit this document because there is no evidence that it was within the scope of a discovery request by S & S and, therefore, withheld by Bank. More

importantly, we find no prejudice to S & S to the admission of this document since S & S, with the Debtor's consent, has had access to Debtor's books and records in prosecuting this objection to the Bank's claim and otherwise as the Chapter 11 plan proponent.

indulgence" may waive the right to insist upon punctual payment. If such a creditor then attempts to enforce a forfeiture without giving prior notice of its intention to the debtor, the debtor may have relief under equity if he demonstrates the ability to perform if reasonable indulgence is granted. *Id.,* 199 A. at 142–43.

The *Warren* Court was clear that waiver, being an equitable doctrine, is limited by the requirement that "he who seeks equity must do equity." *Id.*

> Prior indulgence by the creditor does not give the debtor an automatic right to an extension, but merely a reasonable opportunity to perform, provided he can show that additional time would enable him to do so. The relief is not against the obligation but against the forfeiture on the ground of surprise, and it is conditioned upon the covenant, for the breach of which the forfeiture was declared, being fully and promptly performed. Thus, if a creditor, by a course of indulgence, has waived the right to insist upon punctual performance, but nevertheless enforces a forfeiture without previous notice of intention, and the debtor attempts by appropriate proceedings to recover the property seized by the creditor and to have the forfeiture remitted, it is obvious that no relief will be afforded him in equity unless he tenders belated performance or, at least, is able to demonstrate his ability to perform if reasonable indulgence is granted him. Where a forfeiture is declared because of default in the payment of money, a court of equity will relieve the debtor only upon his paying the debt. Pomeroy's Equity Jurisdiction, 4th Ed., vol. 1, p. 807, § 433.

*Id.* In *Warren,* judgment was entered against the debtor because he could not perform the terms of the case even with "reasonable indulgence."

In the matter before the Court, the Bank's acceptance of reduced payments over a period of time, notwithstanding its default letter, Exhibit B–1, induced the Debtor to believe that the Bank would continue to accept such payments and not exercise the default remedies under the 1365 Note.[10] However, as was the case in *Warren,* the Bank's indulgences alone do not create the waiver since neither the Debtor nor 1365 Associates has tendered performance or demonstrated an ability to perform if reasonable indulgence is granted. It is clear that after the sale of the 1330 Property, full note payments became economically impossible. At best, there is a suggestion that a sale of the 1365 Property could satisfy the Note but there is no record of a buyer for the 1365 Property. The Court finds that a future, somewhat uncertain sale is insufficient to demonstrate an ability to tender full current payments under the 1365 Note.

■ Without regard to the default that does exist under the 1365 Note, we find the same result would obtain if there were no default and we were required to estimate the claim pursuant to § 502(c). The Debtor's liability under the Surety Agreement remains absolute and direct, subject to being triggered by a default under the 1365 Note. The Pennsylvania Supreme Court addressed this issue in *Brock's Assigned Estate (No. 1),* 312 Pa. at 16–17, 166 A. at 781 and stated as follows:

> The absoluteness of a present obligation to pay a certain amount of money on a future day is not affected by the fact that there is a possibility that the obligation will never be discharged by the obligor. That possibility attends all legal obligations.... A surety's obligation is immediate and absolute from the day he enters into it, though in a certain contingency, i.e., payment by his principal, the surety will be released from his obligation.

*Bell),* 97 B.R. 208, 214 (Bankr.E.D.Pa.1989) (failing to strictly enforce an agreement does not in itself constitute a later waiver of strict enforcement of its terms). However, it clearly would have been reasonable for the Debtor to expect the Bank to provide 1365 Associates and it with notice that it would no longer accept the reduced note payments prior to enforcing the payment default.

---

10. This belief may not have been reasonable since according to the testimony of the Bank officer, Ms. Dodel, the Bank's acceptance of the reduced payment was not intended to be a loan modification or a waiver of future payment defaults' and the obligation of 1365 Associates was to pay the full note payment unless the Bank otherwise continues to waive full payment. *See Bell v. Philadelphia Housing Authority (In re*

Thus, in estimating the Bank's claim, the Court will not look to other collateral or the financial resources of other obligors as S & S urges, but rather need only determine the likelihood of a default occurring in the future to trigger Debtor's absolute and primary liability.

■ To the extent default did not already exist, this Court finds that future default would be inevitable and imminent.[11] Our finding is based on the inability of 1365 Associates or the Debtor to service the full amount of the 1365 Note as evidenced by the payment history after the sale of the 1330 Property and the absence of any agreement to restructure the payments under the 1365 Note. The fact that the Bank is oversecured is not dispositive since loan payments cannot be made with illiquid collateral. Of course, if the 1365 Property were sold, the 1365 Note might be paid off and this entire dispute might be moot.

Because the occurrence of a future default under the 1365 Note is both inevitable and imminent, we would estimate the Debtor's liability under the Surety Agreement to be equal to 100% of 1365 Associates' liability under the 1365 Note. *See Pittsburg Construction Company v. West Side Belt Railroad,* 227 Pa. 90, 95, 75 A. 1029, 1030 (1910), *aff'd,* 219 U.S. 92, 31 S.Ct. 196, 55 L.Ed. 107 (1911) (the measure of a surety's liability "is the extent of the principal's liability").

## II.

■ *Distribution to Partners as Reduction of Bank Claim.* At common law, a surety's liability may be discharged if and to the extent that the creditor voluntarily released the principal debtor from liability, un-less the surety consented to such release or the creditor expressly reserved his rights against the surety. A surety may also be discharged of his obligation if the creditor, without the consent of the surety or reserving its rights, made a binding commitment to extend the time for the principal to pay the debt. Also at common law if a creditor surrendered or impaired collateral which served as security for the debt, the surety, unless he consented to the discharge or impairment or the creditor expressly reserved his rights against the surety, may be discharged from his obligation to the extent that the collateral would have produced funds sufficient to pay the debt or a part of the debt. *Keystone Bank v. Flooring Specialists, Inc.,* 513 Pa. 103, 113, 518 A.2d 1179, 1184 (1986) and cases cited therein.

■ S & S argues that the Bank's claim should be reduced by $40,000 because the Bank impaired the value of the collateral for the 1365 Loan when it distributed that amount to 1365 Associates' general partners without the consent of the Debtor. If the $40,000 had been applied to the 1365 Loan, the Debtor's liability under the Surety Agreement would have been reduced by $40,000. At the time the distribution was made, all of the directors of the Debtor, except for Ms. Ryan, were general partners of 1365 Associates. Keith Sanford, the Debtor's President, testified that one general partner in particular, Norman Cahan, insisted on the $40,000 distribution but that none of the general partners objected. In fact, all of the general partners accepted their share of the $40,000 and used the funds to pay taxes relating to the sale of the 1330 Property.

---

**11.** The record reflects that the Debtor is making payments to the Bank pursuant to Cash Collateral Stipulations and that the interest on the Debtor Notes and 1365 Note are current. 1365 Associates' only income, the rentals from the 1365 Property, is insufficient to service the 1365 Note. While the Debtor's President stated his belief that the Bank would accept the reduced payment, the Bank's representative stated that the full amount is owing. While the Bank may have at one time agreed to accept lower payments and stated its intention not to then accelerate, its present intention is what is relevant. Given the absence of any requirement in the 1365 Note for notice of default or acceleration which occurs immediately upon default, the conditions precedent to full payment of the 1365 Note arguably presently exist. However, in light of the Bank's prior action in accepting reduced payments and in light of the extant Cash Collateral Agreement whereby the Bank is consensually accepting payments from the Debtor, we believe the Bank must notify 1365 Associates and the Debtor of its change of position and intention to exercise its right and remedies under the 1365 Note. Upon so doing, the full obligation will be due from 1365 Associates and the Debtor.

S & S argues that the Debtor did not consent to the distribution. In support of its position, it offered the testimony of Mr. Sanford that such consent would have required a corporate resolution. Notably, S & S did not introduce into evidence the Debtor's by-laws to prove that such a resolution was indeed required. The Court found the testimony on this issue somewhat vague and self-serving. Even if a resolution would have been required for the Debtor to formally consent to the distribution, we would be reluctant to reach the result sought by the Debtor. Our task is easier since on this record we conclude that the Debtor acting through its President and directors consented to the distribution when they accepted the distribution.[12] Indeed, it appeared that payment to the partners may have been a necessary precondition to securing the partners' consent to the sale without which Debtor's liability under the Surety Agreement would not have been reduced at all.

Given the common identity of persons receiving the benefit of the distribution and objecting to it now, the result urged by S & S would be inequitable.[13] *See Berwick v. Daniel W. Keuler Realtors, Inc.*, 407 Pa.Super. 528, 533, 595 A.2d 1272, 1274–75 (1991) (Appellant cannot encourage appellees to accept certain financing and then later claim that that financing was somehow objectionable to them). *See also Braniff, Inc. v. GPA Group PLC (In re Braniff, Inc.)*, 118 B.R. 819, 841 (Bankr.M.D.Fla.1989) (quoting *In re Bronx–Westchester Mack Corporation*, 4 B.R. 730, 734 (Bankr.S.D.N.Y.1980) (As courts of equity, bankruptcy courts must apply equitable principles and direct to be done that which ought to be done.)) Consequently, the Bank's claim will not be reduced by the $40,000 partnership distribution.

The Bank's claim for all purposes shall include the full amount due under the 1365 Note as to which the Debtor is surety and will not be reduced by the $40,000 released to the general partners of 1365 Associates out of the Bank's collateral.

---

12. The fact that Ms. Ryan was not a general partner of 1365 Associates and did not receive a share of the distribution does not require a different result. Ms. Ryan testified that she was aware of the distribution. Moreover, her husband, William Ryan, was a general partner of 1365 Associates and accepted his proportionate share of the distribution in order to pay his personal tax liability. The direct benefit received by Mr. Ryan conveyed an indirect benefit on Ms. Ryan. Her silent acceptance of the payment of the distribution to the partners reflects an implied consent to it.

13. We recognize that the ultimate detriment of this transaction is borne by the Debtor's estate and that the Debtor's officers and directors may have had an impermissible conflict in accepting the distribution as general partners of 1365 Industrial Boulevard Associates. We do not decide whether the Debtor or its creditors have a cause of action against the officers and directors to recover the distribution.